Filed 9/4/14

CERTIFIED FOR PARTIAL PUBLICATION*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| DAMERON HOSPITAL ASSOCIATION,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>AAA NORTHERN CALIFORNIA, NEVADA AND UTAH INSURANCE EXCHANGE et al.,<br><br>Defendants and Respondents. | C070475<br><br>(Super. Ct. No. 39201000245260CUMCSTK)<br><br>OPINION ON REHEARING |

APPEAL from a judgment of the Superior Court of San Joaquin County, Carter P. Holly, Judge. Affirmed.

Hatton, Petrie & Stackler, Gregory M. Hatton and John A. McMahon for Plaintiff and Appellant.

Coddington, Hicks & Danforth, Richard G. Grotch, R. Wardell Loveland, Sungjee Lee for Defendant and Respondent AAA Northern California, Nevada and Utah Insurance Exchange; Pollak, Vida & Fisher, Michael M. Pollak and Hamed Amiri Ghaemmaghami for Defendant and Respondent Allstate Insurance Company.

Fred J. Hiestand for The Civil Justice Association of California as Amicus Curiae on behalf of Defendants and Respondents; Davis & Associates and Monte R. Davis, Jr., for Permanent General Assurance Company as Amicus Curiae on behalf of Defendants and Respondents.

---

* Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part V of the discussion.

1

Under California law, hospitals must provide emergency room services without regard for a patient's ability to pay or who will ultimately bear responsibility for the medical bill. (*Prospect Medical Group, Inc. v. Northridge Emergency Medical Group* (2009) 45 Cal.4th 497, 501-502 (*Prospect*).) Depending on who pays the bill for emergency room services, billing rates for the same treatment can vary substantially. (*Howell v. Hamilton Meats & Provisions, Inc*. (2011) 52 Cal.4th 541, 552, 560 (*Howell*).) After patients have received their care, hospitals often face the difficult and complex task of trying to secure payment for the emergency room services. The final cost and identity of the responsible payer of the emergency room services can remain unresolved for years.

Sometimes a patient needs emergency room care due to negligent driving by a third party tortfeasor with automobile liability insurance coverage. In such an instance, the hospital with the emergency room must determine whether the medical bills are the responsibility of the patient, the patient's health care service plan, the tortfeasor, the tortfeasor's liability insurer, or some combination of these potential payers. (*Prospect, supra,* 45 Cal.4th at pp. 501-502; *Parnell v. Adventist Health System/West* (2005) 35 Cal.4th 595, 598 (*Parnell*); Health & Saf. Code, § 1371.4, subd. (b).) Further complicating a hospital's endeavor to bill for emergency room services are varying limits on financial responsibility for the medical services. A patient's financial responsibility may be limited to the copayment amounts specified by the health care service plan. (*Parnell,* at p. 611, fn. 15.) The patient's health care service plan may be limited to paying a negotiated rate that is less than the hospital's customary billing rate.[1]

---

[1] We refer to the lower billing rates payable by health care service plans having contracts with hospitals as "negotiated rates." Although negotiated rates are lower than the "customary rates" charged for emergency room services, they do not necessarily constitute "discount" rates. The California Supreme Court has explained that "if it were established a medical provider's full bill generally represents the value of the services provided, and the discounted price negotiated with the insurer is an artificially low

2

(*Id.* at p. 609.)  Many hospitals enter into contracts with health care service plans to ensure sufficient volume for their emergency rooms and in turn pass along the savings for "buying in bulk" the emergency room services provided.  While many health care service plans contract for such negotiated rates, most automobile liability insurers do not.

The health care service plan in this case, Kaiser Permanente (Kaiser), covered three patients who received care at an emergency room operated by Dameron Hospital Association (Dameron).  The patients were injured due to the negligence of third party tortfeasors who had automobile liability insurance with California Automobile Association Inter-insurance Bureau (AAA)[2] and Allstate Insurance Company (Allstate).  Unlike Kaiser, neither AAA nor Allstate has contracts with Dameron.  In the absence of an agreement for negotiated billing rates, Dameron sought to collect from AAA and Allstate its customary billing rates by asserting liens filed under the Hospital Lien Act (HLA).  (Civ. Code, § 3045.1 et seq.)  AAA and Allstate, however, ignored Dameron's HLA liens when paying settlements to the three Kaiser patients.

Upon learning of the settlements, Dameron sued AAA and Allstate to recover on its HLA liens.  The trial court granted the automobile liability insurers' motions for summary judgment on grounds the patients' debts had already been fully satisfied by their health care service plans.  Reasoning the HLA liens were extinguished for lack of any underlying debt, the trial court dismissed the case.  The trial court further found dismissal was warranted because Dameron failed to timely file some of its HLA liens against AAA.

fraction of that true value, one could make a parallel argument that relieving the defendant of paying the full bill would result in underdeterrence.  The complexities of contemporary pricing and reimbursement patterns for medical providers, however, do not support such a generalization."  (*Howell*, *supra*, 52 Cal.4th at p. 560.)

[2]     California Automobile Association Inter-insurance Bureau is now named AAA Northern California, Nevada and Utah Insurance Exchange.

The central question presented in Dameron's appeal is this: Does a health care service plan's payment of a previously negotiated rate for emergency room services insulate the tortfeasor's automobile liability insurer from having to pay the customary rate for medical care rendered? AAA and Allstate contend they are not responsible for *any* amount after Kaiser paid in full the bill for the emergency room services provided by Dameron. Dameron responds that it contracted with Kaiser to preserve its rights to recover the customary billing rates from tortfeasors and their automobile liability insurers. Dameron asserts the tortfeasors and their liability insurers are responsible for the *entire* bill for medical services at the customary rate –- not just the difference between the reimbursement received from Kaiser and the customary billing rate.

In *Parnell, supra,* 35 Cal.4th 595, the California Supreme Court unanimously held hospitals may not recover their customary rates for emergency room care when they have contractually agreed to accept negotiated rates as payment in full. (*Id.* at p. 609.) In so holding, the Supreme Court acknowledged that "California hospitals face mounting financial pressures, and that many, if not all, of these hospitals may 'face a genuine financial crisis that threatens their ability to continue to serve their communities.' " (*Id.* at p. 611.) *Parnell* noted its holding might "result in a significant hardship for many of these hospitals." (*Ibid.*) To alleviate such hardship, the Supreme Court stated hospitals could turn to the Legislature for changes to the HLA. (*Id.* at p. 611.)

More importantly for purposes of this case, the *Parnell* court held that "the solution lies in the hands of the hospitals. By precluding the Community Hospital from asserting a lien under the HLA in this case, we 'simply give[] effect to' its contracts. (*Lopez v. Morley* [(2004)] 817 N.E.2d [592,] 599.) If hospitals wish to preserve their right to recover the difference between usual and customary charges and the negotiated rate through a lien under the HLA, they are free to contract for this right. Our decision today does not preclude hospitals from doing so. (See, e.g., *Andrews* [*v. Samaritan Health System* (Ct. App. 2001)] 36 P.3d [57,] 61.)" (*Parnell*, *supra*, 35 Cal.4th at p. 611.)

4

Although Dameron claims it should benefit from the California Supreme Court's holding that it may avoid extinguishment of its HLA liens upon receiving payments from health insurers, the contract in this case preceded *Parnell* by 10 years. The Dameron/Kaiser contract did not seek to avail itself of the *Parnell* court's guidance. Instead, the Dameron/Kaiser contract is silent as to whether Dameron may collect from tortfeasors and their automobile insurers after receiving negotiated rate payments from the patients' health care service plans. Dameron attempts to supply the contract term by relying on a history of "uniform conduct" in which Dameron and Kaiser have cooperated in seeking payment from third party tortfeasors and their liability insurers.

We conclude the Dameron/Kaiser contract does not contain the term described by the *Parnell* court as sufficient to preserve the right to recover the customary billing rate for emergency room services from third party tortfeasors.[3] To paraphrase *Parnell,* if Dameron wishes to preserve its right to recover its customary billing rates through an HLA lien, it is free to contract for this right. (*Parnell, supra,* 35 Cal.4th at p. 611.) But Dameron must *actually* contract for this right. (*Ibid.*) A history of voluntary cooperation with Kaiser does not suffice to avail Dameron of the *Parnell* court's guidance on reservation of contractual rights under the HLA. Consequently, the trial court properly granted summary judgment in favor of AAA and Allstate.

As to Dameron's argument that it filed a timely claim relating to patient Rita H.'s HLA lien, we affirm the trial court's dismissal based on the statute of limitations. Dameron has not made a sufficient showing of diligence to toll the claim under the discovery rule.

---

[3] In reaching this conclusion, we do not express any opinion on collections carried out by a commercial health plan in administering federally funded programs (such as Medicare) that may specify who should be deemed the primary payer for treatments caused by third-party tortfeasors. (See, e.g., 42 U.S.C. § 1395y(b)(2)(A)(ii).)

BACKGROUND

## *Dameron's Claims Against AAA and Allstate*

In July 2010, Dameron sued AAA and Allstate for damages as well as injunctive and declaratory relief. Dameron's complaint alleges it gives emergency room care to patients regardless of their ability to pay, as required by Health and Safety Code section 1317. Thus, Dameron provided emergency room services to Denise H.[4] and Don P. The bill for Denise H. amounted to $1,724 and Don P.'s bill was $3,445. After these patients were discharged from the emergency room, Dameron learned each was injured by the negligence of a driver insured by Allstate.

Dameron also provided emergency room services to Rita H., Sara M., and D.S. Rita H.'s emergency room bill totaled $33,831.74, Sara M.'s was $1,976, and D.S.'s was $2,029.76. After these patients were discharged, Dameron learned they were all injured by drivers insured by AAA.

The record indicates Kaiser provided health insurance for each of these patients except Rita H. and D.S. For each of these patient's emergency room services bills Dameron served HLA liens on all entities known to Dameron and who might be liable for causing each patient's injuries. And, for each of these patients, Dameron learned AAA or Allstate paid a settlement to the patient without satisfying any part of Dameron's HLA liens. Dameron filed the present action within a year of learning of the settlements and judgments.

Dameron further alleges each of the contracts with health care service plans for the patients in this case contains an "applicable rate agreement" that "preserves Dameron's HLA rights, as contemplated by the California Supreme Court in *Parnell*[, *supra,* 35 Cal.4th at p. 611]." Dameron asserts it follows the same procedure in collecting on its HLA liens whenever a third party has caused injury to an emergency room patient who

---

[4]     The names of the patients at issue in this case are redacted to protect their privacy.

6

has coverage with a health insurer having a rate agreement contract with Dameron. Specifically, Dameron bills the full amount of the emergency room costs to the injured patient's health plan per Dameron's contract with the health plan. Dameron *also* bills the full amount of emergency room costs to the third party tortfeasor and/or tortfeasor's liability insurer by serving an HLA notice under Civil Code section 3045.3.[5]

If the tortfeasor, tortfeasor's liability insurer, or any responsible party pays Dameron's HLA claim before the patient's health care service plan pays Dameron the negotiated rate, Dameron cancels its bill to the patient's health care service plan. However, if the patient's health plan pays the negotiated rate under the applicable rate agreement before any other responsible party pays under the HLA lien, Dameron "holds the health plan's payment in abeyance (as well as any co-payment received from the injured patient), pending resolution of Dameron's HLA claim." If Dameron recovers money on its HLA claim following payment from the patient's health care service plan, Dameron refunds the patient's copayment and then refunds the health care service plan from the proceeds of the HLA lien recovery. If there are any proceeds remaining after reimbursements to the patient and patient's health plans, Dameron keeps the remainder. In any event, Dameron does not "attempt to collect or retain more than its reasonable and necessary charges in any patient's account."

Dameron's complaint also alleges payments of settlements and judgments to patients while ignoring HLA liens "are not isolated or random events. Rather the HLA violations . . . are part of an industry-wide business strategy adopted primarily by automobile liability insurers in California . . . and by other similarly situated responsible parties under the HLA." In addition to violating the HLA, Dameron claimed the

---

[5]     In other words, Dameron does not seek to "balance bill" tortfeasors or their liability insurers for the difference between the negotiated rates paid by health care service plans and the customary rate Dameron would ordinarily charge. Instead, Dameron seeks to recover the entirety of its customary rates from the tortfeasors and their liability insurers.

7

practices also violated the Unfair Competition Law (Bus. & Prof. Code, § 17200 et seq.).**6**

### *Motions for Summary Judgment*

AAA and Allstate each moved for summary judgment, arguing Dameron could not recover anything under the HLA liens because the underlying debts had been extinguished by payments in full by the patients' health plans. AAA also argued two of the three claims asserted by Dameron were time-barred.

In support of its motion, Allstate introduced the Dameron/Kaiser agreement for the provision of hospital services to Kaiser patients. The Dameron/Kaiser contract, effective January 1, 1995, provides in pertinent part:

"3. Member Billing. [¶] (a) Hospital shall look solely to Kaiser Permanente (or another responsible payer) for compensation for Hospital Services rendered to Members under this Agreement, and, except as expressly provided in this Section, Hospital agrees that in no event, including but not limited to non-payment by Kaiser Permanente, insolvency or breach of this Agreement, shall Hospital bill, charge, collect a deposit from, seek compensation, remuneration or reimbursement from, or have any recourse against any Member for Hospital Services provided pursuant to this Agreement. Hospital further agrees that this provision shall (i) survive the termination of this Agreement regardless of the cause giving rise to termination and shall be construed to be for the benefit of the Members, and (ii) supersede any oral or written contrary agreement now

---

**6** Dameron urges us to consider the judgment entered in an earlier class action lawsuit titled *Ruacho, et al. v. Dameron Hospital Association* (Superior Court San Joaquin County (2012) SV231473), not as "controlling authority in any manner" but to supply "a historical perspective, because it is part and parcel of the uniform performance of the Dameron/Kaiser contract in regard to HLA claims." We decline to do so. As Dameron acknowledges, the trial court's decision in that case cannot be cited as legal authority. (*Bolanos v. Superior Court* (2008) 169 Cal.App.4th 744, 761.) Moreover, the outcome of the earlier and unrelated case does not constitute evidence in this case. (*Johnson & Johnson v. Superior Court* (2011) 192 Cal.App.4th 757, 768.)

existing or hereafter entered into by the parties.  [¶]  (b)  Hospital may assert claims for compensation other than claims against Kaiser Permanente, in the following circumstances:  [¶]  (i)  Copayments. . . .  [¶]  (ii)  Services After Coverage Exhausted or Disallowed. . . .  [¶]  (iii)  No benefit. . . .  [¶]  (iv)  Regular Medicare. . . .  [¶]  (c) Hospital understands and agrees that surcharges against Members are prohibited and Kaiser Permanente shall take appropriate action if surcharges are imposed.  A surcharge is an additional fee which is charged to a Member for a covered Hospital Service but which is not approved by the Commissioner of Corporations or provided for under the applicable Membership Agreement and disclosed in the Member's evidence of coverage."

Dameron opposed summary judgment on grounds the Dameron/Kaiser contract allowed collection of the HLA liens against AAA and Allstate.  Dameron also asserted its claims against AAA were not time-barred because the hospital filed the HLA lien notices within a year of discovering the identity of the responsible payers.

The trial court granted summary judgment in favor of AAA and Allstate.  The trial court reasoned Kaiser's payment of an agreed-upon rate for emergency room payments extinguished the debt owing to Dameron and had the effect of also extinguishing the HLA liens.  As to two of the claims against AAA, the trial court found the discovery rule did not apply to render the HLA claims timely.

Dameron timely filed notices of appeal from the judgments of dismissal.

DISCUSSION

I

*Standards of Review*

We apply the independent standard of review to the trial court's order granting summary judgment.  (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 334.)  As this court has noted, "We review the issues framed by the pleadings to determine the scope of the issues tendered and to determine whether the moving party has established facts

9

negating the opponent's claim and justifying a judgment in the moving party's favor. (*AARTS Productions, Inc. v. Crocker National Bank* (1986) 179 Cal.App.3d 1061, 1064–1065.)  In so doing we determine whether the opposition to the motion demonstrates the existence of a triable issue of material fact.  (*Ibid*.)  We review the evidence in the light most favorable to the opposition to the motion, and liberally construe the opposition's evidence, while strictly scrutinizing the successful party's evidence and resolving any evidentiary ambiguities in the opposition's favor.  (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 768.)"  (*Avidity Partners, LLC v. State of California* (2013) 221 Cal.App.4th 1180, 1192.)  We also independently review contractual agreements, including the question of whether the language used in a contract is ambiguous. (*American Alternative Ins. Corp. v. Superior Court* (2006) 135 Cal.App.4th 1239, 1245.) Finally, "[w]e are not bound by the trial court's reasons for granting summary judgment because we review the trial court's ruling, and not its rationale."  (*Avidity, supra,* at p. 1192.)

## II

### *The HLA as Interpreted in Parnell*

Dameron's right to recover its customary rates for emergency room services from third party tortfeasors and their liability insurers depends on whether the hospital's HLA liens are extinguished when accepting payments by the emergency room patients' health care service plans.  The HLA provides a hospital with a statutory lien against any judgment, settlement, or compromise paid by a third party tortfeasor or tortfeasor's liability insurer to a patient who received emergency room care.  (*Parnell*, *supra*, 35 Cal.4th at p. 598; Civ. Code, § 3045.2.)  Civil Code section 3045.1 states a hospital that "furnishes emergency and ongoing medical or other services to any person injured by reason of an accident or negligent or other wrongful act . . . shall, if the person has a claim against another for damages on account of his or her injuries, have a lien upon the damages recovered, or to be recovered, by the person, or by his or her heirs or personal

10

representative in case of his or her death to the extent of the amount of the reasonable and necessary charges of the hospital."

For the HLA lien to become effective, the hospital must serve written notice of "the amount claimed as reasonable and necessary charges" on each person or entity "known to the hospital and alleged to be liable to the injured person . . . for the injuries sustained prior to the payment of any moneys to the injured person." (Civ. Code, § 3045.3.) The HLA notice must also be served on any known liability insurers responsible for the actions of the alleged tortfeasors. (*Ibid.*) However, the hospital need not provide notice of the HLA lien to the emergency room patient. (*Parnell*, *supra*, 35 Cal.4th at p. 601.)

Tortfeasors and their liability insurers are required to satisfy the HLA lien at the same time as they pay any money to the emergency room patients. As the *Parnell* court explained, "If the tortfeasor pays the injured person 'after the receipt of the notice as provided by [Civil Code] Section 3045.3, without paying to the' hospital 'the amount of its lien claimed in the notice, or so much thereof as can be satisfied out of 50 percent of the moneys due under any final judgment, compromise, or settlement agreement,' then the tortfeasor 'shall be liable to the' hospital 'for the amount of its lien claimed in the notice which the hospital was entitled to receive as payment for the medical care and services rendered to the injured person.' ([Civ. Code,] § 3045.4.)" (*Parnell*, *supra*, 35 Cal.4th at pp. 601-602.) This statutory penalty payment to the hospital does not come from recovery of funds paid to the injured patient, but must be paid separately by the tortfeasor or tortfeasor's liability insurer. (*Mercy Hospital & Medical Center v. Farmers Ins. Group of Companies* (1997) 15 Cal.4th 213, 221.)

The HLA creates a statutory lien that "is 'nonconsensual' and 'compensates a hospital for providing medical services to an injured person by giving the hospital a direct right to a certain percentage of specific property, i.e., a judgment, compromise, or settlement, otherwise accruing to that person.' (*Ibid.*)" (*Parnell*, *supra*, 35 Cal.4th at

11

p. 602.)  *Parnell* further notes that, "[a]s a general rule, '[a] lien is a charge imposed in some mode other than by a transfer in trust upon specific property by which it is made security for the performance of an act.'  ([Civ. Code,] § 2872.)  Because '[a] security interest cannot exist without an underlying obligation' (*Alliance Mortgage Co. v. Rothwell* (1995) 10 Cal.4th 1226, 1235), a lien is typically 'but an incident of the debt secured' (*Lewis v. Booth* (1935) 3 Cal.2d 345, 349) and 'presupposes the existence of a debt' (*Dorr v. Sacred Heart Hosp.* (1999) 228 Wis.2d 425, 597 N.W.2d 462, 470 (*Dorr*))."  (*Parnell*, *supra*, 35 Cal.4th 595, 602-603.)

The typical dependence of a lien on an underlying debt led the *Parnell* court to conclude payment of the underlying debt –- such as by an injured patient's health plan –- extinguished the hospital's HLA lien.  (*Parnell*, *supra*, 35 Cal.4th 595, 602-603.)  Thus, a hospital's acceptance of "payment in full" from a health care service plan relieved the third party tortfeasor and his or her liability insurer from any further payment under the HLA.  (*Ibid.*)  However, the *Parnell* court noted hospitals *could* contractually preserve the right to recover their usual and customary rates from tortfeasors and their liability insurers.  *Parnell* states that "[i]f hospitals wish to preserve their right to recover the difference between usual and customary charges and the negotiated rate through a lien under the HLA, they are free to contract for this right."  (*Id.* at p. 611.)  *Parnell* further noted neither the Insurance Code nor the Health and Safety Code "precludes hospitals from contractually preserving their right to recover 'reasonable and necessary charges' pursuant to a lien under the HLA."  (*Id.* at p. 611, fn. 15.)

The *Parnell* court's unanimous conclusion that hospitals can contractually reserve the right to recover customary emergency room billing rates from third party tortfeasors delineates the extent of its holding that a hospital's acceptance of payment in full from a health care services plan extinguishes any HLA lien premised on the same debt.  (*Parnell*, *supra*, 35 Cal.4th at p. 611 & fn. 16 [noting its "holding relies solely on the absence of a debt underlying the lien" and does not extend to resolving issues of whether

12

the HLA applies in the Medicaid context, violates due process, is subject to waiver by hospitals, or is subject to litigation immunity].)  Contrary to respondents' suggestion, *Parnell's* statements regarding the availability of contractual remedies for hospitals were not mere dicta.  The *Parnell* court's guidance regarding contractual options "was responsive to the issues raised on appeal and was intended to guide the parties" and lower courts in addressing HLA issues in the future.  (*Garfield Medical Center v. Belshé* (1998) 68 Cal.App.4th 798, 806.)  We are bound to follow the Supreme Court's holdings.  (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

In holding California hospitals may contractually reserve the right to recover their customary billing rates from third party tortfeasors, the *Parnell* court cited the example of *Andrews v. Samaritan Health System* (Ct.App. 2001) 36 P.3d 57, 61 (*Andrews*), disapproved on another ground in *Blankenbaker v. Jonovich* (2003) 205 Ariz. 383, 385-386, 71 P.3d 910, 912-913.[7]  (*Parnell*, *supra*, 35 Cal.4th at p. 611.)  In *Andrews,* the Arizona Court of Appeals held injured patients could not prevent hospitals from balance billing by enforcing statutory medical liens on judgments received from third-party tortfeasors.  (*Andrews, supra,* at p. 59.)  In so holding, the *Andrews* court provided two rationales.  (*Id.* at p. 61.)  One rationale was Arizona Revised Statutes, section 33–931, automatically created a medical lien providing that "a [hospital] provider 'is entitled to a lien for the customary charges for care and treatment . . . of an injured person' without specifying further action by the hospitals."  (*Andrews, supra,* at p. 61.)

The other rationale in *Andrews* arose from the language of the contracts between the defendant hospitals and the patients' health care services plans.  *Andrews* explained that "the instant contracts each contained language stating that the hospitals accepted the

---

[7]     Remarkably, none of the parties nor amici curiae mentions *Andrews, supra,* 36 P.3d 57  in any of their extensive briefing on the meaning and continuing validity of *Parnell's* holding hospitals have the ability to contractually retain their right to seek their customary rates for emergency room services.

13

plaintiffs' insurer's payment as 'payment in full,' and all . . . *expressly reserved the right to recapture the difference between any payments made by the insurer and the providers' customary charges*. Unlike the contracts in the cases from other jurisdictions, this reservation clearly qualifies the 'payment in full' language and sets forth the hospitals' expectation to recover their customary charges when possible." (*Andrews*, *supra*, 36 P.3d at pp. 60-61, italics added.) As a consequence, "[t]he fact that the hospitals have no personal recourse against plaintiffs, by virtue of their insurance coverage, does not alter the fact that a debt remains between the hospitals' customary charges and the amounts paid by plaintiffs' insurers." (*Id.* at p. 61.) This contract-based rationale for preserving a hospital's right to recover its customary charges from third-party tortfeasors was cited with approval by the California Supreme Court in *Parnell*, *supra*, 35 Cal.4th at p. 611.

Notably, the patients in *Andrews, supra*, 36 P.3d 57 did not have their recoveries from third party tortfeasors reduced by the hospitals' ability to recover their customary charges when the patients' health plans paid only a negotiated rate because "[i]n their various personal injury suits, plaintiffs all quantified their damages by including the hospitals' full charges for medical services, rather than the discounted amount paid by their insurers." (*Andrews*, *supra*, 36 P.3d at p. 59.) In other words, plaintiffs in *Andrews* were able to claim damages in the amount of customary rates based on the express contracts between the hospitals and the health care service plans. (*Ibid.*) The *Andrews* plaintiffs nonetheless argued the hospitals' reservation of rights to customary rates constituted an unfair assignment of their personal injury claims against the third party tortfeasors. The *Andrews* court rejected the argument, explaining that "[t]he legislature, in limited circumstances, may abrogate the rule against assigning tort claims. [Citation.] The medical lien statute represents the legislature's abrogation of that rule. The abrogation effected by the medical lien statute serves to ease the financial burden on providers and to encourage hospitals to render emergency care to patients without

regard to ability to pay. [Citation.] Here, the plaintiffs' insurers did not assign any rights to the hospitals. Rather, the right to the medical liens springs from [Arizona Revised Statutes] § 33–931. We see no reason to invalidate the medical lien statute as written by the legislature given its obvious value and purpose." (*Andrews*, *supra*, at p. 63.)

Taken together, *Parnell, supra,* 35 Cal.4th 595 and *Andrews* allow for statutory medical liens to recover customary billing rates for emergency room services *if* the hospital has an express contract with the health care service plan to that effect.

### III

### *Parnell's Continuing Validity*

AAA and Allstate argue *Parnell, supra,* 35 Cal.4th 595 is no longer valid authority for the proposition that hospitals can contractually reserve the right to recover their customary rates even after being paid the negotiated rate by injured patients' health plans. In so arguing, AAA and Allstate rely on the Knox-Keene Health Care Service Plan Act of 1975 (Knox-Keene Act) (Health & Saf. Code, § 1340 et seq.) and the California Supreme Court's subsequent decisions in *Prospect, supra,* 45 Cal.4th 497 and *Howell, supra,* 52 Cal.4th 541. We conclude these authorities do not undermine *Parnell's* holding that hospitals may contractually preserve their right to recover their customary rates from third party tortfeasors and their liability insurers.

California hospitals are required to provide emergency care without regard to the injured patient's ability to pay. (Health & Saf. Code, § 1317, subd. (d).) The treating hospital may require only that "the patient or his or her legally responsible relative or guardian . . . execute an agreement to pay therefor or otherwise supply insurance or credit information promptly after the services are rendered." (*Ibid.*) The Knox-Keene Act requires health plans to reimburse hospitals for emergency care even if the hospital is not included in the health care service plan's network. (Health & Saf. Code, § 1371.4, subds. (a) & (d).)

15

The Knox-Keene Act also includes the following patient-protection provisions: "(a) Every contract between a plan and a provider of health care services shall be in writing, and shall set forth that in the event the plan fails to pay for health care services as set forth in the subscriber contract, the subscriber or enrollee shall not be liable to the provider for any sums owed by the plan. [¶] (b) In the event that the contract has not been reduced to writing as required by this chapter or that the contract fails to contain the required prohibition, the contracting provider shall not collect or attempt to collect from the subscriber or enrollee sums owed by the plan. [¶] (c) No contracting provider, or agent, trustee or assignee thereof, may maintain any action at law against a subscriber or enrollee to collect sums owed by the plan." (Health & Saf. Code, § 1379 (Section 1379).)

We reject the contentions of AAA and Allstate that section 1379 insulates them from balance billing by hospitals. Section 1379 does not mention balance billing, third party tortfeasors, or liability insurance companies. Instead, the statute mentions only health care service plans, providers of medical care, and patients. The clear import of section 1379 is to protect *patients* with health care service plan coverage from any collection attempts by providers of such medical care as emergency room services.

Section 1379's patient protections were examined by the California Supreme Court in *Prospect, supra,* 45 Cal.4th 497. *Prospect* involved billing disputes between health care service plans and emergency room physicians with whom they did not have preexisting contractual relationships. (45 Cal.4th at p. 503.) The health care service plans argued the Knox-Keene Act (along with other provisions of law) prevented the emergency room physicians from billing the patients for the difference between the bill submitted and the amount paid by the health care service plans. (*Id.* at pp. 501, 505.) Thus, the question presented for the Supreme Court was whether the lack of contract between the health care service plans and the emergency physicians precluded section

16

1379's prohibition on "balance billing" –- i.e., billing for the difference between the usual and customary rate and the negotiated rate paid. (*Id.* at pp. 505-506.)

The *Prospect* court concluded the Knox-Keene Act precludes any attempt to bill *patients* for the amount exceeding the negotiated rate paid by health care service plans. (*Prospect, supra,* 45 Cal.4th at p. 502.) Instead, the health care service plans and emergency room physicians are required to resolve their billing disputes without injecting their patients into the process. (*Ibid.*) On this point, the *Prospect* court noted that "the Legislature contemplated there may be disputes over the amounts owed to noncontracting providers such as emergency room doctors, and therefore the Knox–Keene Act requires that each [health maintenance organization] 'shall ensure that a dispute resolution mechanism is accessible to noncontracting providers for the purpose of resolving billing and claims disputes.' (§ 1367, subd. (h)(2); see also § 1371.38, subd. (a) [directing the Dept. of Managed Health Care to adopt regulations ensuring that each HMO adopt a dispute resolution mechanism that is 'fair, fast, and cost-effective for contracting and noncontracting providers'].)" (*Prospect, supra,* at p. 507.) Ultimately, however, "[a] patient who is a member of an HMO may not be injected into the dispute." (*Id.* at p. 502.)

The California Supreme Court's decision in *Prospect* does not mention its earlier case of *Parnell, supra,* 35 Cal.4th 595. (See *Prospect*, *supra*, 45 Cal.4th at pp. 497-511.) This omission is explained by the fact *Prospect* did not involve any claim of recovery against third party tortfeasors or their liability insurers. (*Ibid.*) "An opinion is not authority for a point not raised, considered, or resolved therein." (*Styne v. Stevens* (2001) 26 Cal.4th 42, 57.) Nothing in *Prospect* abrogates *Parnell's* holding that hospitals may contract with health care service plans to preserve rights to recover customary billing rates via HLA liens against third party tortfeasors.

We reject AAA's argument that the California Supreme Court's decision in *Howell, supra,* 52 Cal.4th 541 overruled its earlier statement in *Parnell* that hospitals

17

may contract with health care service plans to preserve the right to balance bill third party tortfeasors. *Howell* involved the question of whether an injured patient could sue a tortfeasor for damages that included the customary charges for emergency room care billed by the hospital. (*Id.* at p. 548.) The *Howell* court concluded that when the hospital has accepted a lesser amount as full payment under the terms of a prior agreement with the health care service plan, the injured patient could only recover this negotiated rate. (*Ibid.*)

*Howell* explains that "[t]he collateral source rule, which precludes deduction of compensation the plaintiff has received from sources independent of the tortfeasor from damages the plaintiff 'would otherwise collect from the tortfeasor' [citation], ensures that plaintiff . . . may recover in damages the amounts her [or his] insurer paid for her [or his] medical care. The rule, however, has no bearing on amounts that were included in a provider's bill but for which the plaintiff never incurred liability because the provider, by prior agreement, accepted a lesser amount as full payment. Such sums are not damages the plaintiff would otherwise have collected from the defendant. They are neither paid to the providers on the plaintiff's behalf nor paid to the plaintiff in indemnity of his or her expenses. Because they do not represent an economic loss for the plaintiff, they are not recoverable in the first instance." (*Howell, supra,* 52 Cal.4th at pp. 548-549.)

*Howell* addressed whether a *patient* could recover the customary billing rate from a tortfeasor, whereas this case involves a claim *by the hospital* against tortfeasors and their liability insurers. (*Howell, supra,* 52 Cal.4th at p. 548.) In every instance in which *Howell* articulated its holding, the Supreme Court noted the hospital in that case agreed the negotiated rate constituted payment in full. (*Id.* at pp. 548 [collateral source did not apply because hospital agreed to accept negotiated rate as full payment], 554 [hospital accepted negotiated rate of "$3,600 in full payment for its services to the plaintiff"].)

Rather than overruling *Parnell*, the Supreme Court in *Howell* repeatedly cited its earlier decision with approval. In each of the four instances in which *Howell* cited

18

*Parnell*, the California Supreme Court expressly noted *Parnell* involved a situation in which the hospital accepted a negotiated rate as payment in full. (*Howell, supra,* 52 Cal.4th at pp. 554, 557, 558, 563.) For example, the *Howell* court noted it "reached the *same* conclusion in *Parnell* . . . , holding the hospital could not assert a lien against a patient's tort recovery for its full bill when it had agreed to accept an insurer's lesser reimbursement as full payment." (*Howell*, *supra*, 52 Cal.4th at p. 554, italics added.) Similarly, *Howell* reiterated its holding that, "[h]aving agreed to accept the negotiated amount as full payment, a provider may not recover any difference between that and the billed amount through a lien on the tort recovery. (*Parnell* . . . *, supra*, 35 Cal.4th at p. 598.)" (*Howell*, *supra,* 52 Cal.4th at p. 558.) Based on the hospital's acceptance of a negotiated rate as payment in full, *Howell* concluded that "[p]laintiff cannot meaningfully be said ever to have incurred the full charges. (See *Parnell* . . . *, supra*, 35 Cal.4th at p. 609 [where hospital had agreed with plaintiff's health plan to accept discounted amounts as payment in full, plaintiff owed hospital nothing beyond those discounted payments] . . . .)" (*Howell*, *supra*, at p. 557.) In short, *Howell* does not overrule the *Parnell* court's statement that hospitals have the ability to enter into agreements with health care service plans that preserve the right to recover customary rates from tortfeasors for emergency room care provided.

We are also not persuaded by AAA that its interpretation of *Howell, supra,* 52 Cal.4th 541 was confirmed in *Corenbaum v. Lampkin* (2013) 215 Cal.App.4th 1308 (*Corenbaum*). AAA argues *Corenbaum* stands for the proposition that "the tortfeasor, and by extension his [or her] insurer, is not liable for the delta between what the hospital 'charged' and what it accepted from the health insurer." AAA overstates the scope of decision in *Corenbaum*. The *Corenbaum* court expressly noted that: "As in *Howell*, the medical providers who treated plaintiffs . . . accepted, pursuant to prior agreements, less than the full amount of their medical billings as payment in full for their services." (*Corenbaum, supra,* at p. 1318.) Based on the similarity in the hospitals' acceptance of

19

the negotiated rate as payment in full, *Corenbaum* holds evidence of the customary rate for emergency room services may not be introduced at trial to prove medical expenses or noneconomic damages when the hospital accepted full payment in a lesser amount. (*Id.* at p. 1318.)

Also based on the Supreme Court's guidance in *Howell*, the *Corenbaum* court reasoned that "[a]n insured plaintiff incurs no liability for the negotiated rate differential and suffers no pecuniary loss in that amount." (*Corenbaum*, at p. 1325.) Thus, "[e]vidence of the full amount billed . . . is not relevant to the amount of damages for past medical expenses if the plaintiff never incurred liability for that amount." (*Id.* at p. 1327.) As in *Howell*, the decision in *Corenbaum* did not involve any action by the hospital against the third party tortfeasor or tortfeasor's liability insurer.

Based on our survey of decisional authority following the Supreme Court's unanimous decision in *Parnell, supra*, 35 Cal.4th 595, we conclude no case undermines *Parnell's* guidance to hospitals that they may preserve the right to recover from a third party tortfeasor the differential between the negotiated rate paid by an injured patient's health care service plan and the customary rate billed for the emergency room services. Moreover, neither the HLA nor applicable provisions of Knox-Keene has been amended by the Legislature since the Supreme Court's 2005 decision in *Parnell*. (Civ. Code, §§ 3045.2, 3045.3, 3045.4 [pertinent HLA statutes]; § 1379 [pertinent Knox-Keene statute].) Thus, the Legislature has not changed how the HLA statutory lien operates either in substance or procedure since the *Parnell* court examined the HLA statutory scheme. In short, *Parnell* remains valid insofar as it allows hospitals to contract for a reservation of rights to recover from tortfeasors the differential between the negotiated and the usual and customary rates for emergency room services provided.[8]

---

[8] In so concluding, we are not called to determine whether or to what extent a hospital is limited in the amount it asserts to be its "customary rates." (Cf. *Howell*, *supra*, 52 Cal.4th at p. 551 [limiting economic damages to "any *reasonable* charges for

20

***Whether the Dameron/Kaiser Contract Preserved Dameron's Right to Recover its Customary Emergency Room Rates from Third-party Tortfeasors***

Having concluded Dameron had the prerogative under *Parnell, supra,* 35 Cal.4th 595 to enter into a contract to preserve its billing rights against third party tortfeasors liable for injuries to its emergency room patients, we consider whether the Dameron/Kaiser contract actually preserved such rights. Dameron contends its contract with Kaiser suffices to allow it to pursue its customary billing rate from third party tortfeasors who injure Kaiser-covered patients.

In evaluating Dameron's claim, we apply well-established principles governing review of contractual agreements. "The ordinary rules of contract interpretation apply equally to contracts of insurance. (*Palmer v. Truck Ins. Exchange* (1999) 21 Cal.4th 1109, 1115.) The mutual intention of the contracting parties at the time the contract was formed governs. (Civ. Code, § 1636; *Palmer, supra*, at p. 1115.) We ascertain that intention solely from the written contract if possible, but also consider the circumstances under which the contract was made and the matter to which it relates. (Civ. Code, §§ 1639, 1647.) We consider the contract as a whole and interpret the language in context, rather than interpret a provision in isolation. (*Id*., § 1641.) We interpret words in accordance with their ordinary and popular sense, unless the words are used in a technical sense or a special meaning is given to them by usage. (*Id*., § 1644.) If contractual language is clear and explicit and does not involve an absurdity, the plain meaning governs. (*Id*., § 1638.)" (*American Alternative Ins. Corp. v. Superior Court* (2006) 135 Cal.App.4th 1239, 1245.)

Here, the Dameron/Kaiser contract was entered into in 1995, a decade before the California Supreme Court issued its decision in *Parnell, supra,* 35 Cal.4th 595. The

---

treatment the injured person has paid or, having incurred, still owes the medical provider are recoverable as economic damages"], italics added.)

contract does not expressly reserve to Dameron a right to recover its customary billing rates for emergency room services from anyone. The Dameron/Kaiser contract does not mention HLA liens, third party tortfeasors, or liability insurers for third party tortfeasors. Instead, the contract sets forth the reciprocal obligations of Dameron to provide emergency medical services and Kaiser to pay negotiated rates for those services.[9] Rather than reserving the right to recover the entirety of the customary charge from third party tortfeasors, the Dameron/Kaiser contract states payment of the negotiated rates constitutes payment in full. Exhibit A of the Dameron/Kaiser contract provides:

"[Kaiser] will pay [Dameron] for Covered Services the rates set forth in this Exhibit A, reduced by applicable Copayments . . . . [Dameron] will accept such amounts *as payment in full for Covered Services*, irrespective of the cost to [Dameron] of providing such services, or of [Dameron]'s customary charges for such services." (Italics added.)

This contract provision does not reserve to Dameron any right to recover additional payments from any other person or entity. Moreover, it imposes on Kaiser no obligation to assist or take any other action to help Dameron recover its customary charges from any third party tortfeasor or liability insurer. And, there is no mention of HLA liens. To escape this express agreement to accept the negotiated rate as "payment in full," Dameron looks to the "Member Billing" section of the contract. Specifically, Dameron points to language stating that "Hospital shall look solely to Kaiser Permanente (*or another responsible payer*) for compensation for Hospital Services rendered to Members under this Agreement." (Italics added.)

---

[9]    In the copy of the Dameron/Kaiser contract filed in the trial court, the pages specifying the negotiated billing rates are marked "with[h]eld as proprietary trade secret info." Even so, the parties agree the contract supplied Kaiser with negotiated billing rates for emergency room services that were less than Dameron's customary rates for the same services.

22

Dameron argues the italicized language renders this contract provision sufficiently ambiguous to allow extrinsic evidence to prove that "another responsible payer" includes tortfeasors and their liability insurers. A contract is ambiguous when it contains language that is reasonably susceptible to more than one meaning. (*MacKinnon v. Truck Ins. Exchange* (2003) 31 Cal.4th 635, 648.) For several reasons, the contract's reference to "another responsible payer" cannot reasonably be construed to refer to third party tortfeasors or their liability insurers.

First, the reference to another responsible payer is qualified by the restriction that Dameron is limited to "compensation for Hospital Services rendered to Members *under this Agreement.*" (Italics added.) The purpose of the Dameron/Kaiser contract is to agree upon negotiated billing rates and to insulate patients covered by Kaiser from charges beyond their individual copayment responsibilities. Under this agreement, there is no mention of customary billing rates or HLA liens.

Second, the paragraphs immediately following language cited by Dameron serve to limit Dameron's "claims for compensation" to copayments, services after coverage is exhausted or disallowed by Kaiser, instances in which the patient turns out to have no Kaiser coverage at all, and "regular Medicare." Even if the meaning of "another responsible payer" were ambiguous, these paragraphs preclude any interpretation of the phrase to include third party tortfeasors or their liability insurers.

Third, any interpretation of "another responsible payer" as including third party tortfeasors would create a conflict with the portion of the Dameron/Kaiser contract in which Dameron has agreed to accept the negotiated rates "*as payment in full for Covered Services,* irrespective of the cost to [Dameron] of providing such services." (Italics added.) We reject this interpretation as introducing an unnecessary internal inconsistency into the Dameron/Kaiser contract. "It is a cardinal rule of construction that a contract is to be construed as a whole, effecting harmony among and giving meaning to all the parts

23

thereof. (Civ. Code, § 1641.)" (*People ex rel. Dept. of Parks and Recreation v. West-A-Rama, Inc.* (1973) 35 Cal.App.3d 786, 793.)

Fourth, Dameron's assertion of the ability to collect customary rates from other parties would have the effect of imposing new duties on Kaiser that are not otherwise spelled out in the contract. In its briefing, Dameron contends we should accept a history of cooperation between Dameron and Kaiser in pursuing additional payments from third party tortfeasors. In other words, Dameron argues Kaiser has a contractual *duty* to assist in recovering the customary billing rates for its patients from others. Crediting this argument would mean Dameron could sue Kaiser for breach of contract if that health care service plan did not help pursue Dameron's HLA liens. The Dameron/Kaiser contract spells out no such obligation for Kaiser.

The Dameron/Kaiser contract's silence as to any obligation to assist in collection from third party tortfeasors does not allow us to graft a new obligation into the agreement. Indeed, the contract itself provides that "[a]ny other agreements, promises, negotiations, or representations relating to the subject matter of this Agreement . . . not expressly set forth herein are of no force and effect." "Courts will not add a term about which a contract is silent. (*Moss Dev. Co. v. Geary* (1974) 41 Cal.App.3d 1, 9.)" (*Levi Strauss & Co. v. Aetna Casualty & Surety Co.* (1986) 184 Cal.App.3d 1479, 1486 dismissed, remanded and ordered published sub nom. *Levi Strauss and Co. v. Aetna Cas. and Sur. Co.* (1987) [237 Cal.Rptr. 455].) Instead, "[a] contract extends only to those things which it appears the parties intended to contract. Our function is to determine what, in terms and substance, is contained in the contract, not to insert what has been omitted. We do not have the power to create for the parties a contract that they did not make and cannot insert language that one party now wishes were there." (*Vons Companies, Inc. v. United States Fire Ins. Co.* (2000) 78 Cal.App.4th 52, 58-59.)

Dameron correctly points out that "[n]either law nor equity requires that every term and condition be set forth in a contract." (*Frankel v. Board of Dental Examiners*

(1996) 46 Cal.App.4th 534, 545.) Thus, "usual and reasonable terms found in similar contracts may be considered, unexpressed provisions of the contract may be inferred from the writing, external facts may be relied upon, and custom and usage may be resorted to in an effort to supply a deficiency if it does not alter or vary the terms of the agreement." (*Ibid.*) However, supplying implied terms to give effect to the expressed intent of the contract does not allow us to impose new duties and obligations to which the parties never agreed. "[C]ourts cannot make better agreements for parties than they themselves have been satisfied to enter into or rewrite contracts because they operate harshly or inequitably. It is not enough to say that without the proposed implied covenant, the contract would be improvident or unwise or would operate unjustly. Parties have the right to make such agreements. The law refuses to read into contracts anything by way of implication except upon grounds of obvious necessity." (*Ibid.*)

Although *Parnell, supra,* 35 Cal.4th 595 allows Dameron to contractually reserve the right to recover its customary billing rate for emergency room services for Kaiser patients and caused by third party tortfeasors, Dameron has not done so in this case.[10]

---

[10] We note the summary judgments in favor of AAA and Allstate included claims pertaining to emergency room patients covered by health care service plans other than Kaiser. In the trial court, Dameron argued summary judgment could not be granted in favor of AAA and Allstate because their motions did not seek to dispose of all claims. The trial court granted summary judgment in favor of AAA and Allstate concluding claims involving Kaiser patients failed for lack of a debt underlying Dameron's lien claims. As to the non-Kaiser patients, the trial court found Dameron had not amended the complaint to include these claims. In this appeal, Dameron does not contend the trial court erred in dismissing the claims for five non-Kaiser patients. Accordingly, we affirm also as to the trial court's dismissal of claims premised on these five patients not covered by Kaiser.

Finally, we do not address whether the billing scheme asserted by Dameron to be its contractually reserved right complies with California law by reimbursing Kaiser for the entirety of its payments if Dameron recovers the full customary billing rate from a third party tortfeasor or tortfeasor's liability insurer.

# V

### *Whether Dameron Timely Asserted HLA Lien Claims for Emergency Room Services Provided to Rita H.*

Dameron contends the trial court erred finding the one-year statute of limitations rendered untimely Dameron's claim against AAA for patient Rita H. Specifically, Dameron argues the delayed discovery rule applied to render its HLA claim timely. We disagree.

## A.

### *Trial Court Ruling on the Claims Relating to Rita H.'s Care*

In moving for summary judgment, AAA argued that Dameron's claims -- including those relating to Rita H. -- were untimely because they were filed after the expiration of the one-year statute of limitations imposed by Civil Code section 3045.5.[11] Dameron opposed the motion and introduced a declaration by its credit and collections manager, Craig Haupt. In pertinent part, Haupt declared:

"Dameron acts diligently to attempt to discover whether a payor (such as AAA) has violated the HLA. In doing so, agents of Dameron regularly call entities involved in the underlying personal injury claim (auto insurers such as AAA, attorneys for claimants, known attorneys for tortfeasors, known tortfeasors, etc.), to attempt to learn, via both telephone and written correspondence, whether a payment has been made in violation of the HLA. In many instances it is difficult, however, for Dameron, despite its diligence to learn of a violation of the HLA. It is only through great determination and persistence that Dameron learns of violations of its HLA liens. Accordingly, Dameron often learns

---

[11] Civil Code section 3045.5 provides: "The person, partnership, association, corporation or other institution or body maintaining the hospital may, at any time *within one year* after the date of the payment to the injured person, or to his [or her] heirs, attorney, or legal representative, enforce its lien by filing an action at law against the person, firm, or corporation making the payment and to whom such notice was given as herein provided." (Italics added.)

that an HLA lien has been paid around over a year after the payment around the lien has been made. When this situation arises, Dameron moves swiftly to enforce its HLA lien rights. [¶] . . . With respect to all of the claims discussed by AAA in its motion, and indeed, all of the claims at issue in this action against AAA, Dameron has filed suit within a year of discovering that AAA violated the HLA by ignoring and paying around Dameron's liens."

The trial court dismissed Dameron's claim relating to Rita H. as untimely and explained: "The filing of this Complaint . . . occurred more than one year after the 'first account' and 'second accounts' were resolved by AAA. [¶] . . . [¶] Dameron argues that the discovery rule should apply to extend the running of the statute of limitations because Dameron is often not aware of insurers' settlements with tortfeasors and has to pursue this information by calling or writing involved insurers, counsel, or claimants." The trial court rejected Dameron's argument, explaining: "Dameron offers no evidence of any fiduciary relationship nor of any specific representations or misrepresentations made to it, and that it relied upon, justifying imposition of an estoppel or a delayed discovery rule. It admits that it pursued information regarding settlements, but did not always receive that information in a timely fashion, but it does not provide evidence specific to the two claims alleged to be untimely here. Accordingly, the court declines to apply the delayed discovery rule to these facts."

## B.

### *The Discovery Rule*

As the California Supreme Court has explained, "Generally speaking, a cause of action accrues at 'the time when the cause of action is complete with all of its elements.' (*Norgart* [*v. Upjohn Co.* (1999)] 21 Cal.4th [383,] 397; see *Neel v. Magana, Olney, Levy, Cathcart & Gelfand* (1971) 6 Cal.3d 176, 187 (*Neel*).) An important exception to the general rule of accrual is the 'discovery rule,' which postpones accrual of a cause of action until the plaintiff discovers, or has reason to discover, the cause of action.

(*Norgart, supra*, 21 Cal.4th at p. 397; *Neel, supra*, 6 Cal.3d at p. 187.) [¶] A plaintiff has reason to discover a cause of action when he or she 'has reason at least to suspect a factual basis for its elements.' (*Norgart, supra*, 21 Cal.4th at p. 398, citing *Jolly* [*v. Eli Lilly & Co.* (1988)] 44 Cal.3d [1103,] 1110.)" (*Fox v. Ethicon Endo-Surgery, Inc.* (2005) 35 Cal.4th 797, 806-807 (*Fox*), fn. omitted.)

In *Fox*, the Supreme Court further explained that, "[i]n assessing the sufficiency of the allegations of delayed discovery, the court places the burden on the plaintiff to 'show diligence'; 'conclusory allegations will not withstand demurrer.' " (*Fox, supra*, 35 Cal.4th at p. 808, quoting *McKelvey v. Boeing North American, Inc.* (1999) 74 Cal.App.4th 151, 160.) On this point, the Sixth District Court of Appeal recently held that "[t]he discovery-related facts should be pleaded in detail to allow the court to determine whether the [cause of action] should have been discovered sooner." (*Cansino v. Bank of America* (2014) 224 Cal.App.4th 1462, 1472.)

## C.

### *Dameron's Showing*

The trial court properly concluded Dameron had not made a sufficient showing of diligence to invoke the discovery rule for its HLA claims relating to Rita H. Although Dameron professed to have acted "diligently," it relied on a declaration that failed to mention *any* efforts made to discover payment on the HLA claims relating to Rita H.'s care. Not a single phone call, letter, or effort to inquire about the status of Rita H.'s HLA lien is mentioned in the Haupt declaration. Instead, Dameron recounted its general practices of "regularly" calling and using "great determination and persistence" in following up on its HLA liens. However, Dameron's characterizations of diligence and effort do not describe the frequency or specifics even of its normal practices for HLA liens. Because conclusory allegations of diligence fail to warrant application of the discovery rule, the trial court correctly dismissed Dameron's claims relating to Rita H.'s care.

28

DISPOSITION

The judgment is affirmed.  Each party shall bear its own costs.  (Cal. Rules of Court, rule 8.278(a)(5).)

                                        HOCH        , J.

We concur:

      ROBIE     , Acting P. J.

      BUTZ      , J.