Filed 1/5/22  Dameron Hospital Assn. v. United Services Automobile Assn. CA3

## NOT TO BE PUBLISHED

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| DAMERON HOSPITAL ASSOCIATION, | C087225 |
| Plaintiff and Appellant, | |
| | (Super. Ct. No. STKCVUOCT20110003017) |
| v. | |
| UNITED SERVICES AUTOMOBILE ASSOCIATION, | |
| Defendant and Respondent. | |

SUMMARY OF THE APPEAL

Dameron Hospital Association (Dameron) brought an action against United Services Automobile Association (USAA) in which Dameron alleged USAA improperly ignored and refused to honor an assignment of underinsured motorist (UM) and medical payment (MP) benefits to Dameron contained in Conditions of Admission (COAs) signed by a patient when Dameron provided the signatory and her daughter emergency and

1

follow-up medical treatment. Though Dameron and the patients' health insurance provider, Health Net HMO (Health Net or HNI), had a contract that specified rates at which Health Net would pay for Dameron to treat Health Net members, Dameron wanted to recoup higher payments for its services directly from USAA out of UM and MP benefits due to the patients. USAA successfully demurred to one of two alleged causes of action and, later, successfully brought a motion for summary judgment to dispose of the entire suit. The trial court entered judgment for USAA.

On appeal, we affirm the trial court's orders and judgment on two separate grounds. First, any purported assignment of the UM and MP benefits contained in the COAs to cover emergency medical services would be void as contrary to public policies reflected in laws designed to protect patients with health insurance from unexpected financial obligations when receiving emergency medical services, regardless of whether the insurer and provider had entered into a contract for services. Second, the COAs cannot reasonably be relied upon to entitle Dameron to recoup the payments it seeks from the patients' UM and MP benefits here. Accordingly, we affirm the trial court's judgment.

We note that in this matter both of the patients treated by Dameron had health insurance, and we do not consider whether the COAs could have created enforceable assignments had either patient not had health insurance. We consider whether a COA using similar, but not identical, language may have created an enforceable assignment of MP or UM benefits belonging to patients without health insurance in *Dameron Hospital Association v. AAA Northern California, Nevada & Utah Insurance Exchange* (C086518, app. pending, argued Dec. 20, 2021).

2

A.      Treatment and COAs

In September 2006, Mercedes and her daughter Jana, a minor, were injured in an automobile accident and treated at Dameron.

Dameron presented Mercedes with COA forms for her and Jana, and she signed them both.  Dameron treated Mercedes's injuries on at least three other occasions, and, at each visit, according to Craig Haupt, the Credit and Collection Manager for Dameron, she signed a COA.

Paragraph 1 of the COA form, labeled "CONSENT AND AGREEMENT TO MEDICAL AND SURGICAL PROCEDURES," included this language:  "[t]he undersigned assigns to the hospital indicated and the physician(s) any insurance benefits due the patient or insured because of the hospital and medical services, and authorize[s] payment directly to them."

In paragraph 3, the patient or patient's representative agreed to "pay the account of the hospital in accordance with the regular rates and terms of the hospital."

Paragraph 8, labeled "ASSIGNMENT OF INSURANCE BENEFITS," included this language: "[t]he undersigned authorizes, whether he/she signs as agent or as patient, direct payment to the hospital and the physicians specifically associated with the patient's medical care, of any insurance benefits otherwise payable to or on behalf of the undersigned for this hospitalization or for these outpatient services, outpatient observation care, including emergency services if rendered, at a rate not to exceed the provider's regular charges.  It is agreed that payment to the hospital, pursuant to this authorization, by an insurance company shall discharge said insurance company of any and all obligations under a policy to the extent of such payment.  It is understood by the undersigned that he/she is financially responsible for charges not covered by this agreement."

B.    Dameron's Agreement with Health Net

At the time of the accident, Mercedes and Jana had health insurance through Health Net.  Health Net and Dameron had a "Provider Participation Agreement" where Dameron would provide specified medical services to Health Net insureds.  It included language where Health Net would pay and Dameron would accept scheduled rates for services "as payment in full."  More specifically, it included the following paragraphs regarding Health Net's compensation to Dameron for services provided to Health Net members:

"4.1 Payment Rates.  Health Net or Payor shall pay, and Provider shall accept as payment in full for Contracted Services the amounts payable by Health Net or Payor as set forth in the applicable Addenda, Schedules and Exhibits to this Agreement, less Copayments, Coinsurance and Deductibles payable by Beneficiaries in accordance with the applicable Benefit Program.  [¶] . . . [¶]

"4.5 Collection of Copayments.  Provider shall collect all Copayments due from Beneficiaries, and shall not waive or fail to pursue collection of Copayments from Beneficiaries.  Provider shall not charge Beneficiary any fees or Surcharges for Contracted Services rendered pursuant to this Agreement (except for authorized Copayments, Coinsurance and Deductibles).  In addition, Provider shall not collect a sales, use or other applicable tax from Beneficiaries for the sale or delivery of Contracted Services. . . .

"4.6 Beneficiary Held Harmless.  Provider agrees that in no event, including, but not limited to, non-payment by Health Net or a Payor, insolvency of Health Net or a Payor, or breach of this Agreement, shall Provider bill, charge, collect a deposit from, seek compensation, *remuneration*, or reimbursement from, *or have any recourse against Beneficiaries or persons acting on their behalf other than Health Net* or a Payor for Contracted Services provided pursuant to this Agreement.  This provision shall not

4

prohibit collection of Copayments, Coinsurance or Deductibles made in accordance with applicable Benefit Program Requirements. Provider further agrees that: a) this provision shall survive the termination of this Agreement regardless of the cause giving rise to termination and shall be construed to be for the benefit of Beneficiaries; and b) this provision supersedes any oral or written contrary agreement now existing or hereafter entered into between Provider and Beneficiaries or persons acting of their behalf. [¶] . . . [¶]

"4.9 Third Party Recoveries; Workers Compensation. In the event Provider provides Contracted Services to HNI Members for injuries resulting *from the acts of third parties, or resulting from work related injuries, Provider shall have the right to recover from any settlement, award, recovery from any responsible third-party, or responsible liability insurer the reasonable and necessary charges for such Contracted Services using the procedures for such recovery provided by the Hospital Lien Act, Civ. Code section 3045.1 et. seq., and shall have all rights and benefits afforded by that statute*. Provider shall notify HNI of any such recovery and shall provide HNI with an accounting of all such sums recovered. In the event HNI has compensated Provider for such Contracted Services and Provider has recovered sums from a third party, Provider agrees to pay such recovered sums to HNI up to the amounts that HNI paid to Provider, to the extent that HNI has not recovered such amounts from its own third party recovery efforts. Provider shall pay these amounts to HNI within sixty (60) days of HNI informing Provider of the amounts HNI recovered from its own third party recovery efforts, if any. This section 4.7 [*sic*] does not obligate, nor does it prohibit, either HNI or Provider to undertake such third party recovery efforts." (Italics added.)

C.    USAA Policy

The driver of the automobile that struck the automobile Jana and Mercedes were in had insurance, but the liability limit for the policy was $25,000. At the time of the

5

accident, Mercedes and Jana were covered by a USAA policy that provided them with $50,000 per person UM coverage, and $5,000 per person of MP coverage. The $25,000 limit for the other driver acted as an offset to Mercedes's UM limit of $50,000, reducing the amount she could recover in UM benefits under her policy to $25,000. Thus, the amount of combined MP and UM coverage for which she was potentially eligible was $30,000.

At the request of counsel for Mercedes and Jana, USAA issued a check of $9,000 to Health Net to satisfy a lien it had. USAA then paid Mercedes the remaining $21,000 left that was available to her under her UM and MP coverages. USAA paid Jana $4,146.50 in benefits from her MP coverage.

In October 12, 2009, Dameron sent a notice of lien under Civil Code section 3045.1 demanding $4,146.50 to cover Dameron's treatment of Jana, in which Dameron stated it was entitled to MP or UM benefits payable to or on behalf of Jana. In an accompanying cover letter, Dameron also indicated the cost for Mercedes's medical treatment was $51,788.85. In so doing, Dameron was seeking payment at its full, non-negotiated rates, which were higher payments than it could collect from Health Net under its agreement with Health Net.

D.    Procedural History

Dameron filed an action against USAA on February 28, 2011. In the First Amended Complaint, under the first cause of action, Dameron sought an injunction prohibiting USAA from ignoring the purported assignments of benefits contained in the COAs signed by Mercedes when Dameron treated her and her daughter. Dameron alleged it was entitled to the requested relief because USAA had engaged in "unfair business practices" as defined in the Unfair Business Practices Act (Bus. & Prof. Code, § 17200, et seq.) in refusing to meet Dameron's demands to make payments under assignments of benefits. The second cause of action alleged USAA had violated the

6

assignments of benefits, and thus violated its contract with the insureds, in refusing to honor the assignments of benefits and make payments to Dameron. The trial court sustained a demurrer to the first cause of action without leave to amend the complaint.

Dameron and USAA filed cross motions for summary adjudication on the remaining cause of action in April 2017. The trial court denied Dameron's motion; granted USAA's; and, after the parties stipulated to dismiss claims not at issue here, entered judgment in USAA's favor.

In this appeal, Dameron challenges the trial court's decision to sustain the demurrer on the first cause of action and to find in USAA's favor in ruling on the cross-motions for summary adjudication on the second cause of action.

We affirm the trial court's ruling and judgment.

DISCUSSION

I

*Standard of Review*

A court must grant a motion for summary judgment when "all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) In moving for summary judgment, defendants have the burden to show that the cause of action has no merit because an essential element cannot be established or there is a complete defense. (Code Civ. Proc., § 437c, subd. (p)(2); *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850, 861.)

On appeal, we review the record and the determination of the trial court de novo, viewing the evidence in the light most favorable to plaintiffs as the losing parties. (*Kahn v. East Side Union High School Dist.* (2003) 31 Cal.4th 990, 1003.) We apply de novo review to questions of law regarding statutory interpretation. (*Earl v. State Personnel Bd.* (2014) 231 Cal.App.4th 459, 462.) "We also independently review contractual

7

agreements, including the question of whether the language used in a contract is ambiguous. (*American Alternative Ins. Corp. v. Superior Court* (2006) 135 Cal.App.4th 1239, 1245.)" (*Dameron Hospital Assn. v. AAA Northern California, Nevada & Utah Ins. Exchange* (2014) 229 Cal.App.4th 549, 558 (*Dameron*).) "We are not bound by the trial court's reasons for granting summary judgment because we review the trial court's ruling, and not its rationale. (*Kids' Universe v. In2Labs* (2002) 95 Cal.App.4th 870, 878 [116 Cal. Rptr. 2d 158].)" (*Avidity Partners, LLC v. State of California* (2013) 221 Cal.App.4th 1180, 1192.)

"A demurrer tests the legal sufficiency of factual allegations in a complaint." (*Rakestraw v. California Physicians' Service* (2000) 81 Cal.App.4th 39, 42.) The standard of review on appeal from a dismissal after an order sustaining a demurrer is well established. "[W]e review the order de novo, exercising our independent judgment about whether the complaint states a cause of action as a matter of law. [Citations.]" (*Lazar v. Hertz Corp.* (1999) 69 Cal.App.4th 1494, 1501.) We give the complaint a reasonable interpretation, and treat the demurrer as admitting all material facts properly pleaded. (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318.) "We do not, however, assume the truth of contentions, deductions, or conclusions of fact or law. [Citation.]" (*Moore v. Regents of University of California* (1990) 51 Cal.3d 120, 125.) Legal questions that arise at the pleading stage include the interpretation of a statute or the application of a statutory provision to facts assumed to be true for purposes of the demurrer. (*Walker v. Allstate Indemnity Co.* (2000) 77 Cal.App.4th 750, 754.)

II

*An Assignment of the Patients' UM an MP Benefits for Emergency Care Is Contrary to Public Policy*

"The consideration of a contract must be lawful within the meaning of [Civil Code] Section 1667." (Civ. Code, § 1607.) Under Civil Code section 1667, "[t]hat is not

8

lawful which is [¶] . . . [¶] [c]ontrary to the policy of express law, though not expressly prohibited." Here, we find that assignment of the patients' UM and MP benefits to pay for emergency care would be unlawful within the meaning of Civil Code sections 1607 and 1667, and, therefore, void given the patients' Health Net coverage and Health Net's agreement with Dameron. (Civ. Code, § 1608.)

A.    <u>Laws Governing Health Insurance Plan Payment of Medical Care</u>

California Health and Safety Code section 1317, subdivision (a), requires hospitals that render emergency services to any person suffering a condition "in which the person is in danger of loss of life, or serious injury or illness" upon request. The emergency service provider must provide the services regardless of the patient's, "insurance status, economic status, [or] ability to pay for medical services," and, "without first questioning the patient or any other person as to his or her ability to pay therefor." (Health & Saf. Code, § 1317, subs. (b) & (d).) However, "the patient or his or her legally responsible relative or guardian shall execute an agreement to pay therefor or otherwise supply insurance or credit information promptly after the services are rendered." (Health & Saf. Code, § 1317, subd. (d).)

Under the Knox-Keene Health Care Services Plan Act of 1975 (Health & Saf. Code, §§ 1340-1399.864 (Knox-Keene))--which exists, in part "to ensure the best possible health care for the public at the lowest possible cost by transferring the financial risk of health care from patients to providers" (Health & Saf. Code, § 1342, subd. (d))-- health care service plans, or their contracting medical providers, must "reimburse providers for emergency services and care provided to its enrollees, until the care results in stabilization of the enrollee . . . [except as not relevant here]." (Health & Saf. Code, § 1371.4, subd. (b).) Also under Knox-Keene, contracts between healthcare service plans and health care providers must be in writing, and "shall set forth that in the event the plan fails to pay for health care services as set forth in the subscriber contract, the subscriber

9

or enrollee shall not be liable to the provider for any sums owed by the plan." (Health & Saf. Code, § 1379, subd. (a).) When a contract has not been reduced to writing, or if a written contract does not have the "required prohibition, the contracting provider shall not collect or attempt to collect from the subscriber or enrollee sums owed by the plan." (Health & Saf. Code, § 1379, subd. (b).)

In *Prospect Medical Group, Inc. v. Northridge Emergency Group* (2009) 45 Cal.4th 497, 502 (*Prospect*) our Supreme Court examined this statutory scheme and considered if, when a health care service plan "submits a payment lower than the amount billed," by the emergency room service provider, "can the emergency room doctors directly bill the patient for the difference between the bill submitted and the payment received—i.e., engage in the practice called 'balance billing'?" The Court concluded that, "billing disputes over emergency medical care must be resolved solely between the emergency room doctors, who are entitled to a reasonable payment for their services, and the [health care service plan], which is obligated to make that payment. *A patient who is a member of [a health care service plan] may not be injected into the dispute*. Emergency room doctors may not bill the patient for the disputed amount." (*Ibid.*, italics added.)

Hence, it is worth observing, that if there was no assignment of the patients' UM and MP benefits, Dameron could not recoup from the patient the difference between its negotiated rates for emergency services under the Health Net agreement and its regular rates, or demand the patients pay anything other than their deductible and copayments for that care.

B.    The Hospital Lien Act

With the Hospital Lien Act (Civil Code, § 3045.1 et seq., HLA), the Legislature established one mechanism through which hospitals that provide emergency services can recoup costs from an entity other than a patient's health care service plan. Civil Code section 3045.1 states, "[e]very person, partnership, association, corporation, public entity,

10

or other institution or body maintaining a hospital licensed under the laws of this state which furnishes emergency and ongoing medical or other services to any person injured by reason of an accident or negligent or other wrongful act not covered by" sections not applicable here "shall, if the person has a claim against another for damages on account of his or her injuries, have a lien upon the damages recovered, or to be recovered, by the person, or by his or her heirs or personal representative in case of his or her death to the extent of the amount of the reasonable and necessary charges of the hospital and any hospital affiliated health facility, . . . in which services are provided for the treatment, care, and maintenance of the person in the hospital or health facility affiliated with the hospital resulting from that accident or negligent or other wrongful act."  An HLA lien, "shall apply whether the damages are recovered, or are to be recovered, by judgment, settlement, or compromise." (Civ. Code, § 3045.2.)  The amount a hospital can collect under an HLA lien is limited to "so much thereof as can be satisfied out of 50 percent of the moneys due under any final judgment." (Civ. Code., § 3045.4.)

In *Parnell v. Adventist Health System/West* (2005) 35 Cal.4th 595, 603 (*Parnell*), our Supreme Court considered the legislative history of the HLA and concluded the ability of an emergency service provider to collect payment for its services under the HLA "requires the existence of an underlying debt owed by the patient to the hospital . . . , absent such a debt, no lien may attach." (*Parnell*, *supra*, 35 Cal.4th at p. 609.) Thus, when an emergency service provider enters into an agreement with a health care service plan and agrees to accept a specified amount from the plan as " 'payment in full,' " and then the health care plan provides it with a payment in the amount specified under the agreement, the emergency care provider "may not assert a lien under the HLA against [the patient's] recovery from the third party tortfeasor." (*Ibid.*)  This is so, because, under the terms of the agreement, the patient's "entire debt to the hospital has therefore been extinguished." (*Ibid.*)

11

However, emergency care providers do not have to choose between the ability to contract with health care service plans and the ability to collect higher rates for care using the HLA. As this court concluded in *Dameron, supra*, 229 Cal.App.4th at page 554, if, "hospitals wish to preserve their right to recover the difference between usual and customary charges and the negotiated rate through a lien under the HLA, they are free to contract for this right" when negotiating their contracts with health care service providers.

In *Dameron* we "reject[ed] the contentions . . . that [Health and Safety Code] section 1379 insulates," tortfeasors' automobile insurers, "from balance billing by hospitals. Section 1379 does not mention balance billing, third party tortfeasors, or liability insurance companies. Instead, the statute mentions only health care service plans, providers of medical care, and patients. The clear import of section 1379 is to protect *patients* with health care service plan coverage from any collection attempts by providers of such medical care as emergency room services." (*Id.* at p. 563.)

### C. Uninsured Motorist Coverage

Uninsured and underinsured motorist policies are governed generally by Insurance Code section 11580.2, "which requires automobile liability insurers to offer insurance for damages or wrongful death caused by both uninsured and underinsured motorists." (*Quintano v. Mercury Casualty Co.* (1995) 11 Cal.4th 1049, 1053; see also Ins. Code, § 11580.2, subds. (a)(1) & (p)(7).) As used in Insurance Code section 11580.2, "the term 'uninsured motor vehicle' generally includes 'underinsured motor vehicle.' " (*Quintano*, *supra*, at p. 1053.) "Underinsured motorist coverage was created to provide additional coverage for the insured who is injured by a tortfeasor who has minimal liability insurance." (*Ibid.*)

Though uninsured and underinsured insurance policies exist to assure persons injured in automobile accidents a minimum level of payment when their injuries are the

12

fault of uninsured or underinsured motorists, courts have emphasized the that uninsured and underinsured motorist insurance provider is the insurer of patient, not the tortfeasor or the tortfeasor's insurer. (*Weston Reid, LLC v. American Insurance Group, Inc.* (2009) 174 Cal.App.4th 940, 948-949 (*Weston*); *Haering v. Topa Ins. Co.* (2016) 244 Cal.App.4th 725, 733) Uninsured and underinsured motorist policies, " 'are not "third party" coverages. They are strictly "first party" coverages because the insurer's duty is to compensate its own insured for his or her losses, rather than to indemnify against liability claims from others.' " (*Weston*, *supra*, 174 Cal.App.4th at p. 950.)

D.      Med-Pay Benefits

"Automobile med-pay insurance provides first party coverage on a no-fault basis for relatively low policy limits (generally ranging from $ 5,000 to $ 10,000) at relatively low premiums. (*Jones v. California Casualty Indem. Exch.* (1970) 13 Cal. App. 3d Supp. 1, 3 [] ['There is no fault or liability connected with this provision']; see Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 1999) P 6:708, p. 6E-2 [' . . . coverage does not depend on the insured's liability . . . benefits are payable regardless of whether the insured was at fault'].) The coverage is primarily designed to provide an additional source of funds for medical expenses for injured automobile occupants without all the burdens of a fault-based payment system. (Croskey et al., Cal. Practice Guide: Insurance Litigation, *supra*, P 6:1221, p. 6G-4.) There is no statutory obligation for med-pay benefits." (*Nager v. Allstate Ins. Co.* (2000) 83 Cal.App.4th 284, 289-290.)

E.      An Assignment of the Patients' UM and MP Benefits for Emergency Care Would Be Contrary to Law

Here, Dameron is attempting to collect more for emergency medical services than the payments it negotiated for with the patients' health care provider by claiming funds that would come from the patients' first party UM and MP benefits. And, as part of this

13

effort, Dameron interjected Mercedes, by asking her to sign COAs that Dameron argues gave Dameron permission to obtain those funds. That is, Dameron asked Mercedes to give Dameron the authority to secure from her first party benefits something in addition to or in lieu of what Health Net would provide for medical services. This effort is contrary to the statutory policy of protecting patients, "with health care service plan coverage from any collection attempts by providers of such medical care as emergency room services." (*Dameron*, *supra*, 229 Cal.App.4th at p. 563.) For the same reason an emergency room provider cannot interject a patient into a dispute with a medical insurance provider over the reasonableness of its rates by billing the patient for the disputed amount (see *Prospect*, *supra*, 45 Cal.4th at p. 502), it cannot attempt to avoid this prohibition by instead going after UM and MP benefits using a patient assignment. Patients with medical insurance coverage expect that coverage will "insulate [them] from any monetary obligation for such medical care." (*Whiteside v. Tenet Healthcare Corp.* (2002) 101 Cal.App.4th 693, 705 (*Whiteside*).) When a medical care provider pursues a patient's UM and MP benefits to recoup more than what the health insurance company would otherwise pay on behalf of the patient, they are reducing funds that are intended to be available to compensate the patient directly.

We recognize that, in theory, a payment to a provider made under the HLA can ultimately diminish funds that go to a patient, and in *Dameron* we allowed that a medical service provider can recoup more than the rates it has agreed to in a contract with a health insurer provided that contract with the insurer allows for it. (*Dameron*, *supra*, 229 Cal.App.4th at p. 563.) However, Dameron's collection efforts here are markedly distinguishable. The funds potentially available through the HLA are made available via a statutorily established lien which limits the portion of the funds the hospital can collect. (See Civ. Code., § 3045.4.) Moreover, the HLA does not rely on assignments made by a patient at the hospital.

14

Dameron's efforts to secure the patients' UM and MP benefits to pay for emergency services through an assignment contained in the COAs is contrary to patient protections created by Knox-Keene and statutes related to the provision of emergency care as summarized in *Prospect* and cannot be allowed under the law.

Numerous times throughout its briefs, Dameron argues that Insurance Code section 520; *Fluor Corp. v. Superior Court* (2015) 61 Cal.4th 1175 (*Fluor*); and, to a lesser extent, *Henkel Corp. v. Hartford Accident and Indemnity Company* (2003) 29 Cal.4th 934 (*Henkel*), require USAA to accept the purported assignment of benefits contained in the COAs. We disagree.

Insurance Code section 520 states that, "[a]n agreement not to transfer the claim of the insured against the insurer after a loss has happened, is void if made before the loss except as . . . [not relevant here]."

In *Henkel*, our Supreme Court considered whether a corporate entity that had acquired the product line of another corporate entity had "acquired the benefits of the insurance policies issued by" an insurer to the original owner of the product line "to cover lawsuits based on injuries sustained during the policy period." The Court reached its decision without considering Insurance Code section 520, and concluded "that under the circumstances of this case any assignment of benefits does require the consent of the insurers." (*Henkel*, *supra*, 29 Cal.4th at p. 938; see *Fluor*, *supra*, 61 Cal.4th at p. 1180 [noting Insurance Code section 520 was not cited in *Henkel*].) As part of its analysis, the Court observed that, "each of the [insurance] policies [at issue] contained clauses providing that there could be no '[a]ssignment of interest under this policy' without the insurer's consent endorsed on the policy," and that, "[s]uch clauses are generally valid and enforceable." (*Henkel*, *supra*, 29 Cal.4th at p. 943.)

In *Fluor*, our Supreme Court revisited its *Henkel* "determination . . . regarding the enforceability of 'consent-to-assignment' clauses in third party liability insurance policies" in light of Insurance Code section 520 and concluded it "dictates a result

15

different from that reached in *Henkel*." (*Fluor*, *supra*, 61 Cal.4th at p. 1180.) Accordingly, the Court held that a consent-to-assignment clause that read, "[a]ssignment of interest under this policy shall not bind the Company until its consent is endorsed hereon," could not operate to allow a third party liability insurer to refuse "to honor an insured's assignment of the right to invoke defense or indemnification coverage regarding" a loss that occurs within the time limits of the policy. (*Id.* at pp. 1183 & 1175.)

The issues raised here are distinguishable from the issues contemplated by *Henkel*, *Fluor*, and Insurance Code section 520. Here, we are not dealing with an insurer who refuses to accept the valid assignment of insurance benefits from one corporate entity to another. We are also not considering a scenario in which USAA wants to enforce a provision in its policies with its insureds wherein it claims it will not honor otherwise lawful assignments. We are dealing with an insurer refusing to accept an assignment that is, by its very nature, contrary to public policy. Here, Dameron wants to use the purported assignment to collect more than it would otherwise be entitled to take from the patients under the law, to the possible financial detriment of those patients. "It is axiomatic that cases are not authority for propositions not considered." (*People v. Ault* (2004) 33 Cal.4th 1250, 1275, fn. 10.)

III

*The COA Did Not Create the Assignment Dameron Seeks*

In addition to the reasons stated above, we find that, under the undisputed facts here, COAs signed by Mercedes cannot be enforced to assign to Dameron any of the patients' UM benefits or MP benefits as sought here.

"The term 'adhesion contract' refers to standardized contract forms offered to consumers of goods and services on essentially a 'take it or leave it' basis without affording the consumer a realistic opportunity to bargain and under such conditions that

16

the consumer cannot obtain the desired product or services except by acquiescing in the form contract." (*Wheeler v. St. Joseph Hospital* (1976) 63 Cal.App.3d 345, 356 (*Wheeler*).) "The distinctive feature of a contract of adhesion is that the weaker party has no realistic choice as to its terms. [Citations] [¶] A hospital's standard printed 'Conditions of Admission' form possesses all the characteristics of a contract of adhesion. As the court stated in *Tunkl v. Regents of University of California* [(1963)] 60 Cal.2d [92], 102: 'The would-be patient is in no position to reject the proffered agreement, to bargain with the hospital, or in lieu of agreement to find another hospital. The admission room of a hospital contains no bargaining table where, as in a private business transaction, the parties can debate the terms of their contract. As a result, we cannot but conclude that the instant agreement manifested the characteristics of the so-called adhesion contract. . . .' " (*Wheeler*, 63 Cal.App.3d at pp. 356-357.)

With contracts of adhesion, "[e]nforceability depends upon whether the terms of which the adherent was unaware are beyond the reasonable expectations of an ordinary person or are oppressive or unconscionable. ' "In dealing with standardized contracts, courts have to determine what the weaker contracting party could legitimately expect by way of services according to the enterpriser's 'calling' and to what extent the stronger party disappointed reasonable expectations based on the typical life situation." ' [Citations.]" (*Wheeler*, *supra*, 63 Cal.App.3d at pp. 356-357.)

Applying these principles to the COAs, we find the COAs did not create the enforceable assignment of the patients' benefits that Dameron argues was made here. Though it did not consider this precise issue, the analysis in *Whiteside, supra,* 101 Cal.App.4th 693 informs our analysis. In *Whiteside*, the Second District Court of Appeal considered whether a hospital breached its admissions agreements with a patient and his individual health insurer when, after the individual health insurer paid for the patient's service according to its agreement with the hospital, the hospital accepted an additional payment from another insurer with whom the patient held a group health

17

insurance policy. (See *id.* at pp. 698 & 700.) The court held that both the contracts and California law permitted the hospital to collect the additional payment from the group insurer. (*Id.* at p. 698.) In finding the agreement between the patient and the hospital allowed for the payment by the group health insurer to the hospital instead of the patient, the court considered language very similar to the assignment language at issue here. (*Id.* at p. 704.) The court reasoned, "[e]ven viewing the Conditions of Services agreement as a contract of adhesion, and subjecting it to close scrutiny, we reach the same result. The assignment clause, and the applicable contracts taken as a whole, do not defeat the reasonable expectation of insureds who choose to use preferred providers. Such insureds benefit substantially when using a preferred provider. Under the Blue Shield policy here, if an insured uses a nonpreferred provider, he or she would be obligated to pay the difference between the rate Blue Shield specifies it will pay for nonpreferred provider's services and the amount of the hospital's customary charges; some nonpreferred providers' services are not covered at all; and use of nonpreferred providers substantially increases the calendar year deductible. Whiteside's notion that by having dual coverage he could 'pocket' the money from his group policy every time he had a claim that was covered by his personal insurer is simply not a reasonable expectation. He either ignores or misapprehends the provisions of his insurance policies regarding the payment of claims. *The basic obligation of the medical insurers is to pay the medical providers directly for their services and to insulate the insured from any monetary obligation for such medical care. Whiteside is entitled to no more than that under the terms of his coverage.*" (*Id.* at p. 705, fn. omitted, italics added.)

In contrast to the health insurance benefits at issue in *Whiteside*, persons with UM policies expect benefits to be paid directly to them to compensate them for their bodily injuries. Likewise, when those persons have health insurance, they expect their personal obligation to pay medical service providers will be capped with their deductibles and copayments, and that everything else will be covered by their health insurer. Thus, when

18

a patient or its representative assigns, "any insurance benefits due the patient or insured because of the hospital and medical services, and authorize payment directly to," the hospital, it is reasonable and likely the patient believes that the health insurance s/he has purchased to cover medical services is what the hospital intends to collect as a result of the assignment; not that the hospital is going to rely on this language (1) to take from UM benefits s/he gets to compensate for a bodily injury; or (2) to demand MP benefits be used to pay the hospital above its negotiated rates with the health insurer.

Similarly, when the patient assigns and authorizes the medical service provider to collect payments from "any insurance benefits otherwise payable to or on behalf of the undersigned *for this hospitalization or for these outpatient services, outpatient observation care*, including emergency services if rendered, at a rate *not to exceed the provider's regular charges*," the patient likely and reasonably would believe it has simply agreed that any funds due under its health insurance plan will be directly paid to the hospital at the regular rates negotiated between the provider and the health insurance plan. It is not reasonable to expect the patient to agree to use its UM and MP coverage-- at a risk of diminishing the amount he or she can collect in benefits--to subsidize higher than the negotiated payments to the hospital.

Under these circumstances, the COAs cannot reasonably be read to contain an assignment of the patients' UM and MP benefits that would allow Dameron to go after USAA to collect an additional payment for medical services--emergency or otherwise-- above what Dameron had negotiated as payment for services with Health Net.

DISPOSITION

We affirm the trial court's judgment.

_____

HULL, J.

We concur:

_____

RAYE, P. J.

_____

MAURO, J.

20