Filed 1/5/22; Certified for Publication 2/2/22 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| DAMERON HOSPITAL ASSOCIATION, | C086518 |
| Plaintiff and Appellant, | (Super. Ct. No. STKCVUOCT20110006939) |
| v. | |
| AAA NORTHERN CALIFORNIA, NEVADA & UTAH INSURANCE EXCHANGE, | |
| Defendant and Respondent. | |

SUMMARY OF THE APPEAL

Appellant Dameron Hospital Association (Dameron) requires patients or their family members to sign Conditions of Admissions (COAs) when Dameron provides the patients' medical care. The COAs at issue in this action contain language that assigns to Dameron direct payment of uninsured and underinsured motorist (UM) benefits and medical payment (MP) benefits that would otherwise be payable to those patients under

1

their automobile insurance policies. Here, Dameron treated five of AAA Northern California, Nevada & Utah Insurance Exchange's (also known as California State Automobile Association Inter-Insurance Bureau, here CSAA) insureds for injuries following automobile accidents. Those patients had UM and/or MP coverage as part of their CSAA coverage, and Dameron sought to collect payment for those services from the patients' UM and/or MP benefits at Dameron's full rates. Instead of paying to Dameron the lesser of either all benefits due to the patients under their UM and MP coverage, or Dameron's full charges, CSAA paid portions of those benefits directly to the patients which left balances owing on some of Dameron's bills. Dameron sued CSAA to collect UM and MP benefits it maintains CSAA owed Dameron under the assignments contained in the COAs.

The trial court concluded that Dameron could not enforce any of the assignments contained in the COAs and entered judgment in CSAA's favor following CSAA's successful motion for summary judgment.

Here, we hold Dameron cannot collect payment for emergency services from the UM or MP benefits due to patients that were covered under health insurance policies. Additionally, we find (1) the COA forms are contracts of adhesion; (2) it is not within the reasonable possible expectations of patients that a hospital would collect payments for emergency care directly out of their UM benefits; and (3) a trier of fact might find it is within the reasonable expectations of patients that a hospital would collect payments for emergency care directly out of their MP benefits. Finally, we find that the parent of a minor lacked the authority to assign UM or MP benefits payable to that minor under a policy taken out by his nonparent legal guardian. Accordingly, we conclude that Dameron could not maintain causes of action to collect MP or UM benefits due to four of the five patients directly from CSAA. However, consistent with this opinion, the trial court can consider whether an enforceable assignment of MP benefits was made by one adult patient.

2

FACTS AND HISTORY OF THE PROCEEDINGS

General Factual Background

O.N., P.F., Stephen L., R.D., and D.W. were each in separate vehicle accidents. All of the patients were treated for injuries at Dameron following their accidents.

At the time of the patients' respective accidents and treatment at Dameron, they were covered by CSAA automobile insurance policies that included UM coverage and/or MP coverage. CSAA's policies described its MP coverage as follows: "We will pay reasonable expenses incurred within one year from the date of accident by an insured person who sustains bodily injury as a result of an accident covered under this Part for necessary medical, surgical, X-ray, and dental treatment, including prosthetic devices, eyeglasses, and hearing aids and necessary ambulance, hospital, professional nursing, and funeral costs." It indicated, with respect to MP benefits, "[w]e may pay the insured person or the person(s) providing the necessary services, or the person(s) responsible for payment of expenses incurred under this Part, as we deem appropriate."

CSAA described its UM coverage for bodily injury as follows: "COVERAGE D1 - UNINSURED MOTORISTS BODILY INJURY COVERAGE  [¶]  We will pay damages, other than punitive or exemplary damages, for bodily injury to an insured person, which an insured person is legally entitled to recover from the owner or operator of an uninsured motor vehicle. The bodily injury must be caused by accident and arise out of the ownership, maintenance or use of the uninsured motor vehicle.  [¶] Determination whether an insured person is legally entitled to recover damages or the amount of damages shall be made by agreement between the insured person and us. If no agreement is reached, the decision will be made by arbitration."

At the time of the accidents, O.N. and P.F. had health care insurance coverage. This record does not tell us if any of the other patients had health insurance.

Before they left the hospital, each patient or a member of their family signed a COA, that included the following paragraph numbered 11 regarding an assignment of insurance benefits and third party billing:

"The undersigned (for him or herself and the patient) assigns to the hospital, and to the physician(s), and to the other health care professionals providing services to the patient during this hospitalization (or on an outpatient basis) all insurance benefits of any kind that are, or that might be owed, or otherwise due for hospital and/or health care services of any kind provided to the patient.  This assignment includes, but is not limited to, all health plan and health insurance benefits, all medical payments coverage under any policy of insurance, and all uninsured and underinsured motorist insurance benefits payable to or on behalf of the patient.

"The undersigned (for him or herself and the patient) authorizes direct payment to the hospital (and [to the] physicians specifically associated with the patient's medical care, and to any other health care professionals specifically associated with the patient's medical care) of any insurance benefits otherwise payable to or on behalf of the patient and/or the undersigned for this hospitalization, or for outpatient services or outpatient observation care, and for any emergency services rendered, at a rate not to exceed the hospital's, physician's, or health care professional's regular billed charges.

"Payment to the hospital pursuant to this assignment shall discharge an insurance company and/or health plan of its obligations to the patient, but only to the extent of such payment.  The undersigned and the patient remain at all times financially responsible for all charges of the hospital, and for all charges of all physicians and health care professionals specifically associated with the patient's medical care, to the extent that the charges are not paid or otherwise resolved with finality by the patient's insurer and/or health plan.

"Payment of the hospital's charges by the patient's insurer or health plan may not eliminate the hospital's right to collect its charges from third parties or their liability

4

insurers in cases where a third party is legally responsible for causing an injury, illness, or other condition treated by the hospital. In some cases, the hospital's right to collect its charges from responsible third parties and their liability insurers under California's Hospital Lien Act may be governed by a contract between the hospital and the patient's health plan or insurer. Under no circumstances shall the total amount collected and retained by the hospital for treating an injury, illness or condition caused by a third party exceed the billed charges of the hospital."

According to Craig Haupt, the Credit & Collection Manager for Dameron, who has had that position since 1989, "[a]ll patients are required to sign the COA, or to have the COA signed on their behalf, before the patient leaves the hospital. In rare cases, injured patients may leave the hospital without signing the COA, and without a family member signing on their behalf. This oversight does not excuse patients from signing the COA, and their failure to sign the COA does not change the terms and conditions under which all patients at Dameron are treated." Haupt believes COAs are "contracts of necessity."

Additional factual background will be provided as to specific patients in the discussion below.

Procedural Background

Dameron filed this action on May 11, 2011. The First Amended Complaint contains two causes of action. In the first cause of action, Dameron seeks an injunction prohibiting CSAA from engaging in "unfair business practices" in violation of Business and Professions Code section 17200 et seq. (the Unfair Competition Law). The second cause of action seeks damages and declaratory relief to remedy CSAA's alleged breach of contract in failing to honor the patients' purported assignments of their UM and/or MP benefits to Dameron. Both causes of action hinge on Dameron's position that, in failing to honor the purported assignments and pay UM and MP benefits to Dameron, CSAA

5

acted unfairly and/or unlawfully. The trial court sustained CSAA's demurrer to the first cause of action without leave to amend.

CSAA brought a motion for summary judgment on the first amended complaint and the trial court entered a judgment in CSAA's favor.

Dameron appeals.

## DISCUSSION

## I

### *The First Cause of Action Under the Unfair Business Practices Act*

In its opening brief, Dameron does not mention, let alone ask for relief from, the trial court's ruling on the demurrer. Dameron also makes no argument as to the proper standard of review for this court to apply when reviewing rulings on demurrer. Dameron also made no argument as to why, specifically, CSAA violated the Unfair Competition Law in its opening brief. Dameron also did not include a copy of the ruling on the demurrer with its appendix. Instead, the demurrer is first addressed in CSAA's filings where CSAA, (1) included the ruling on the demurrer with a supplemental appendix it filed with its response; and (2) described the ruling and stated the only cause of action remaining when the motion for summary judgment was considered and on appeal is the claim for damages and declaratory relief based on CSAA's alleged failure to honor the assignments.

Presumably realizing it had forgotten about the ruling on the demurrer and wanting to at least give it a passing acknowledgment, in its reply Dameron asks this court to "reinstate Dameron's unfair competition law . . . claims against [CSAA]." However, Dameron still does not make an argument about the proper standard of review when considering a ruling on a demurrer or the application of the Unfair Competition Law.

"An appellant . . . forfeits an issue by failing to raise it in his or her opening brief." (*Doe v. California Dept. of Justice* (2009) 173 Cal.App.4th 1095, 1115.) " 'Obvious

6

considerations of fairness in argument demand that the appellant present all of his points in the opening brief. To withhold a point until the closing brief would deprive the respondent of his opportunity to answer it or require the effort and delay of an additional brief by permission. Hence the rule is that points raised in the reply brief for the first time will not be considered, unless good reason is shown for failure to present them before.[] [Citations.]' (9 Witkin, Cal. Procedure (3d ed. 1985) § 496, p. 484, italics omitted.)" (*Neighbours v. Buzz Oates Enterprises* (1990) 217 Cal.App.3d 325, 335, fn. 8.)

Dameron forfeited its right to argue its first cause of action should be reinstated by failing to raise that argument in its opening brief.

II

*Standard of Review Related to Motions for Summary Judgment*

A court must grant a motion for summary judgment when "all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) In moving for summary judgment, defendants had the burden to show that the cause of action has no merit because an essential element cannot be established or there is a complete defense. (Code Civ. Proc., § 437c, subd. (p)(2); *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850, 861.)

On appeal, we review the record and the determination of the trial court de novo, viewing the evidence in the light most favorable to plaintiffs as the losing parties. (*Kahn v. East Side Union High School Dist.* (2003) 31 Cal.4th 990, 1003.) We apply de novo review to questions of law regarding statutory interpretation. (*Earl v. State Personnel Bd.* (2014) 231 Cal.App.4th 459, 462.) "We also independently review contractual agreements, including the question of whether the language used in a contract is ambiguous. (*American Alternative Ins. Corp. v. Superior Court* (2006) 135 Cal.App.4th

7

1239, 1245.)" (*Dameron Hospital Assn. v. AAA Northern California, Nevada & Utah Ins. Exchange* (2014) 229 Cal.App.4th 549, 558 (*Dameron*).) "We are not bound by the trial court's reasons for granting summary judgment because we review the trial court's ruling, and not its rationale. (*Kids' Universe v. In2Labs* (2002) 95 Cal.App.4th 870, 878 [].)" (*Avidity Partners, LLC v. State of California* (2013) 221 Cal.App.4th 1180, 1192.)

III

*An Assignment of O.N.'s and P.F.'s UM and MP Benefits to Pay for Emergency Care Is Contrary to Public Policy*

"The consideration of a contract must be lawful within the meaning of [Civil Code] Section 1667." (Civ. Code, § 1607.) Under Civil Code section 1667, "[t]hat is not lawful which is . . . [c]ontrary to the policy of express law, though not expressly prohibited." Here, we find that assignment of O.N.'s MP benefits and P.F.'s UM benefits to pay for emergency care would be unlawful within the meaning of Civil Code sections 1607 and 1667, and, therefore, void, since the patients had health insurance. (Civ. Code, § 1608.)

A. Additional Facts

   1. O.N.'s Benefits and Payment for His Treatment

O.N. was injured on April 16, 2010, and Dameron's emergency department treated him for injuries the same day. According to a letter from CSAA to O.N., he had MP coverage with a cap of $25,000.

On May 14, 2010, CSAA sent $1,214.14 in MP benefits to American Medical Response West and $145 in MP benefits to Dr. Aziz Kamal to cover services provided to O.N. after the accident. On May 27, 2010, CSAA sent Dameron Emergency Physicians a payment of $596 from MP benefits.

8

Later, in July 2010, Dameron sent CSAA additional billing totaling $28,577.31, for services it rendered to O.N. following the accident, along with the COA signed by O.N.'s wife. O.N. then forwarded CSAA copies of explanations of benefits that he received from his health insurance provider, Keenan HealthCare, that indicated Dameron had charged the $28,577.31 for the services, and, applying a negotiated discount, the health insurer had paid Dameron $630 for those services.

CSAA responded to Dameron's bill for $28,577.31 with a letter in which CSAA stated it had received information that "this billing has been paid for by [the] insured's health carrier" and it "issued payment to our insured directly for the amount of the accepted payment for his treatment." CSAA then sent O.N. $660 in MP benefits to cover Dameron hospital emergency charges.

### 2. P.F.'s Benefits and Payment for Her Treatment

P.F. was in an accident on June 27, 2010, and Dameron provided emergency services for her injuries the same day. The driver of the other car involved in the accident fled the scene. A letter to William F. from CSAA regarding the family's automobile insurance coverage does not indicate that the policy included MP or UM coverage in any specific amount, but P.F. later entered a settlement with CSAA under which she collected UM benefits.

On September 1, 2010, Haupt sent a letter to CSAA in which he advised CSAA that P.F. had assigned her UM and/or MP benefits to Dameron. Dameron included a notice of lien and a statement indicating it had provided P.F. with $8,902.28 worth of medical services. According to an explanation of benefits, Kaiser paid Dameron a negotiated rate of $957 for those services.

CSAA and P.F. settled her claim for UM benefits with CSAA for an undisclosed amount in December 2010.

9

B.  <u>Laws Governing Health Insurance Plan Payment of Medical Care</u>

California Health and Safety Code section 1317, subdivision (a), requires hospitals that render emergency services to any person suffering a condition "in which the person is in danger of loss of life, or serious injury or illness" upon request.  The emergency service provider must provide the services regardless of the patient's, "insurance status, economic status, [or] ability to pay for medical services," and, "without first questioning the patient or any other person as to his or her ability to pay therefor."  (Health & Saf. Code, § 1317, subs. (b) & (d).)  However, "the patient or his or her legally responsible relative or guardian shall execute an agreement to pay therefor or otherwise supply insurance or credit information promptly after the services are rendered."  (Health & Saf. Code, § 1317, subd. (d).)

Under the Knox-Keene Health Care Services Plan Act of 1975 (Health & Saf. Code, §§ 1340-1399.864 (Knox-Keene))--which exists, in part "to ensure the best possible health care for the public at the lowest possible cost by transferring the financial risk of health care from patients to providers" (Health & Saf. Code, § 1342, subd. (d))-- health care service plans, or their contracting medical providers, must "reimburse providers for emergency services and care provided to its enrollees, until the care results in stabilization of the enrollee, except" as not relevant here (Health & Saf. Code, § 1371.4, subd. (b)).  Also under Knox-Keene, contracts between health care service plans and health care providers must be in writing, and "shall set forth that in the event the plan fails to pay for health care services as set forth in the subscriber contract, the subscriber or enrollee shall not be liable to the provider for any sums owed by the plan." (Health & Saf. Code, § 1379, subd. (a).)  When a contract has not been reduced to writing, or if a written contract does not have the "required prohibition, the contracting provider shall not collect or attempt to collect from the subscriber or enrollee sums owed by the plan."  (Health & Saf. Code, § 1379, subd. (b).)

In *Prospect Medical Group, Inc. v. Northridge Emergency Group* (2009) 45 Cal.4th 497, 502 (*Prospect*) our Supreme Court examined this statutory scheme and considered if, when a health care service plan "submits a payment lower than the amount billed," by the emergency room service provider, "can the emergency room doctors directly bill the patient for the difference between the bill submitted and the payment received—i.e., engage in the practice called 'balance billing'?"  The Court concluded that, "billing disputes over emergency medical care must be resolved solely between the emergency room doctors, who are entitled to a reasonable payment for their services, and the [health care service plan], which is obligated to make that payment.  *A patient who is a member of [a health care service plan] may not be injected into the dispute*. Emergency room doctors may not bill the patient for the disputed amount."  (*Ibid.*, italics added.)

Hence, it is worth observing, that if there was no assignment of O.N.'s and P.F.'s UM and MP benefits, Dameron would be prohibited from reaching the funds paid directly to the patients under their policies to recoup the difference between the rates Dameron has negotiated with their health insurers and its regular rates, or to demand they pay to Dameron anything other than their deductible and copayments for that care.

C.  The Hospital Lien Act

With the Hospital Lien Act (Civil Code, § 3045.1 et seq., HLA), the Legislature established one mechanism through which hospitals that provide emergency services can recoup costs from an entity other than a patient's health care service plan.

Civil Code section 3045.1 states, "[e]very person, partnership, association, corporation, public entity, or other institution or body maintaining a hospital licensed under the laws of this state which furnishes emergency and ongoing medical or other services to any person injured by reason of an accident or negligent or other wrongful act not covered by" sections not applicable here, "shall, if the person has a claim against another for damages on account of his or her injuries, have a lien upon the damages

recovered, or to be recovered, by the person, or by his or her heirs or personal representative in case of his or her death to the extent of the amount of the reasonable and necessary charges of the hospital and any hospital affiliated health facility, . . . in which services are provided for the treatment, care, and maintenance of the person in the hospital or health facility affiliated with the hospital resulting from that accident or negligent or other wrongful act." An HLA lien, "shall apply whether the damages are recovered, or are to be recovered, by judgment, settlement, or compromise." (Civ. Code, § 3045.2.) The amount a hospital can collect under an HLA lien is limited to "so much thereof as can be satisfied out of 50 percent of the moneys due under any final judgment." (Civ. Code, § 3045.4.)

The ability of an emergency service provider to collect payment for its services under the HLA "requires the existence of an underlying debt owed by the patient to the hospital . . . , absent such a debt, no lien may attach." (*Parnell v. Adventist Health System/West* (2005) 35 Cal.4th 595, 609.) Thus, when an emergency service provider enters into an agreement with a health care service plan and agrees to accept a specified amount from the plan as " 'payment in full,' " and then the health care plan provides it with a payment in the amount specified under the agreement, the emergency care provider "may not assert a lien under the HLA against [the patient's] recovery from the third party tortfeasor." (*Ibid.*) This is so, because, under the terms of the agreement, the patient's "entire debt to the hospital has therefore been extinguished." (*Ibid.*)

However, emergency care providers do not have to choose between the ability to contract with health care service plans and the ability to collect higher rates for care using the HLA. As this court concluded in *Dameron, supra,* 229 Cal.App.4th at page 554, if, "hospitals wish to preserve their right to recover the difference between usual and customary charges and the negotiated rate through a lien under the HLA, they are free to contract for this right" when negotiating their contracts with health care service providers.

12

In *Dameron* we "reject[ed] the contentions . . . that [Health and Safety Code] section 1379 insulates," tortfeasors' automobile insurers, "from balance billing by hospitals.  Section 1379 does not mention balance billing, third party tortfeasors, or liability insurance companies.  Instead, the statute mentions only health care service plans, providers of medical care, and patients.  The clear import of section 1379 is to protect *patients* with health care service plan coverage from any collection attempts by providers of such medical care as emergency room services." (*Id.,* 229 Cal.App.4th at p. 563.)

D.  <u>Uninsured</u> and <u>Underinsured</u> <u>Motorist</u> <u>Coverage</u>

UM policies are governed generally by Insurance Code section 11580.2, "which requires automobile liability insurers to offer insurance for damages or wrongful death caused by both uninsured and underinsured motorists." (*Quintano v. Mercury Casualty Co.* (1995) 11 Cal.4th 1049, 1053 (*Quintano*); see also Ins. Code, § 11580.2, subds. (a)(1) & (p)(7).)  As used in Insurance Code section 11580.2, "the term 'uninsured motor vehicle' generally includes 'underinsured motor vehicle.' " (*Quintano*, *supra*, 11 Cal.4th at p. 1053.)  "Underinsured motorist coverage was created to provide additional coverage for the insured who is injured by a tortfeasor who has minimal liability insurance." (*Ibid.*)

Though UM policies exist to assure persons injured in automobile accidents a minimum level of payment when their injuries are the fault of uninsured or underinsured motorists, courts have emphasized that the UM insurance provider "is the insurer of the . . . patient," not the tortfeasor or the tortfeasor's insurer. (*Weston Reid, LLC v. American Insurance Group, Inc.* (2009) 174 Cal.App.4th 940, 948-949 (*Weston*); *Haering v. Topa Ins. Co.* (2016) 244 Cal.App.4th 725, 733.)  UM policies, " 'are not "third party" coverages.  They are strictly "first party" coverages because the insurer's duty is to

compensate its own insured for his or her losses, rather than to indemnify against liability claims from others.' " (*Weston*, *supra*, 174 Cal.App.4th at p. 950.)

E. Med-Pay Benefits

"Automobile med-pay insurance provides first party coverage on a no-fault basis for relatively low policy limits (generally ranging from $ 5,000 to $ 10,000) at relatively low premiums.  (*Jones v. California Casualty Indem. Exch.* (1970) 13 Cal.App.3d Supp. 1, 3 [91 Cal. Rptr. 726] ['There is no fault or liability connected with this provision']; see Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 1999) P 6:708, p. 6E-2 [' . . . coverage does not depend on the insured's liability . . . benefits are payable regardless of whether the insured was at fault'].)  The coverage is primarily designed to provide an additional source of funds for medical expenses for injured automobile occupants without all the burdens of a fault-based payment system. (Croskey et al., Cal. Practice Guide: Insurance Litigation, *supra*, P 6:1221, p. 6G-4.) There is no statutory obligation for med-pay benefits."  (*Nager v. Allstate Ins. Co.* (2000) 83 Cal.App.4th 284, 289-290.)

F. An Assignment of the O.N. 's and P.F. 's UM and/or MP Benefits for Emergency Care Would Be Contrary to Law

Here, Dameron is attempting to collect more for emergency medical services than the payments it negotiated with O.N.'s and P.F.'s health insurance providers by claiming funds that would come from the patients' first party UM and MP benefits.  And, as part of this effort, Dameron brought the patients into a fee dispute by asking them or their family members to sign COAs that purport to give Dameron permission to make a claim on those funds.  That is, Dameron asked the patients to give Dameron the authority to secure from the patients' first party benefits something in addition to or in lieu of what the patients' health insurers would provide for medical services.  This effort is contrary to the statutory policy of protecting patients, "with health care service plan coverage from

14

any collection attempts by providers of such medical care as emergency room services."
(*Dameron*, *supra*, 229 Cal.App.4th at p. 563.) For the same reason an emergency room provider cannot interject a patient into a dispute with a medical insurance provider over the reasonableness of its rates by billing the patient for the disputed amount (see *Prospect*, *supra*, 45 Cal.4th at p. 502), it cannot attempt to avoid this prohibition by instead claiming UM or MP benefits using a patient assignment. Patients with medical insurance coverage expect that coverage will "insulate [them] from any monetary obligation for such medical care." (*Whiteside v. Tenet Healthcare Corp.* (2002) 101 Cal.App.4th 693, 705 (*Whiteside*).) When a medical care provider pursues a patient's UM and MP benefits to recoup more than what the health insurance company would otherwise pay for the patient, they are attempting to reduce a capped amount of funds that are intended to compensate the patient for the patient's losses and expenses.

Dameron's efforts to secure O.N.'s MP benefits and P.F.'s UM benefits to pay for emergency services through an assignment contained in the COAs is contrary to patient protections created by Knox-Keene and statutes related to the provision of emergency care as summarized in *Prospect* and cannot be allowed.

IV

*D.W.'s Mother Lacked Authority to Assign His MP Benefits*

A. Additional Facts

D.W. was injured on May 13, 2011, and Dameron's emergency department treated him for injuries the same day. D.W. was a minor and lived with his grandmother, Sandra M., who claimed to be his guardian and who held the CSAA policy that covered D.W. According to a letter from CSAA to Sandra M., D.W. had MP coverage with a cap of $1,000. It appears D.W.'s mother and not his grandmother--or even D.W.--signed his COA.

15

One health insurance claim form indicates D.W. received $426 worth of emergency services from Dameron on May 13, 2011. On June 11, 2011, CSAA sent his grandmother $426 in MP benefits to pay for D.W.'s "ER bill."

On June 16, 2011, Dameron sent a letter to CSAA in which Dameron indicated D.W.'s MP and UM benefits had been assigned to Dameron. Dameron enclosed a bill indicating it had provided D.W. with $12,662.40 worth of services, and stated in the letter that payment for those services might be recoverable as UM or MP costs. In response, on June 27, 2011, CSAA sent D.W.'s grandmother a letter indicating "medical bills relating to [D.W.'s] claim have reached your Medical Payments Coverage policy limit . . . . Please note that this means we cannot pay for any additional medical payments benefits for this claim, and any additional bills received will be forwarded to your attention for handling." On June 28, 2011, CSAA sent D.W.'s grandmother $574 in MP benefits as payment towards a "Medical Bill."

On July 18, 2011, Haupt sent a letter to CSAA in which he stated that Dameron provided CSAA with notice of the purported assignment on June 16, 2011, and demanded that CSAA remit the lesser of either the $12,662.40 billed for Dameron service or the amount of MP benefits CSAA had paid to the patient. CSAA responded to Haupt with a letter stating, "[w]e received the hospital bill 2 weeks after receiving the physician's bill. After paying the physician's bill, only $574 was left over. The $574 balance was paid to the patient's guardian, Sandra M., with instructions to pay the hospital. This payment was made in accordance with our policies and procedures. ¶ Please contact Ms. M. for restitution."

B. <u>D.W.'s</u> <u>Mother</u> <u>Did</u> <u>Not</u> <u>Create</u> <u>an</u> <u>Assignment</u> <u>of</u> <u>MP</u> <u>Benefits</u> <u>Secured</u> <u>by</u> <u>D.W.'s</u> <u>Grandmother</u> <u>and</u> <u>Guardian</u>

"[An] assignment, to be effectual, must be a manifestation to another person by the owner of the right indicating his intention to transfer . . . the right to such other

16

person, or to a third person." (*Cockerell v. Title Ins. & Trust Co.* (1954) 42 Cal.2d 284, 291.) One means of determining if a party has made an assignment is by looking at the written instrument in which the assignment was made. (See *California Ins. Guarantee Assn. v. Workers' Comp. Appeals Bd.* (2012) 203 Cal.App.4th 1328, 1335 ["In determining whether an assignment has been made, 'the intention of the parties as manifested in the instrument is controlling.' [Citation.]"].)

Here, the individual who took out and paid for the policy at issue—D.W.'s grandmother--did not sign the COA. His mother signed it. As such, we ask if D.W.'s mother was an authorized agent to sign an agreement that assigned the MP benefits under the grandmother's insurance policy.

"[A]n agency cannot be created by the conduct of the agent alone; rather, conduct by the principal is essential to create the agency. Agency 'can be established either by agreement between the agent and the principal, that is, a true agency [citation], or it can be founded on ostensible authority, that is, some intentional conduct or neglect on the part of the alleged principal creating a belief in the minds of third persons that an agency exists, and a reasonable reliance thereon by such third persons.' (*Lovetro v. Steers* (1965) 234 Cal.App.2d 461, 474–475 [44 Cal. Rptr. 604]; see Civ. Code, §§ 2298, 2300.) ' " 'The principal must in some manner indicate that the agent is to act for him, and the agent must act or agree to act on his behalf and subject to his control.' . . ." [Citations.] Thus, the "formation of an agency relationship is a bilateral matter. Words or conduct by *both principal and agent* are necessary to create the relationship . . . ." ' (*van't Rood[ v. County of Santa Clara* (2003)] 113 Cal.App.4th [549, 571,] italics added.)" (*Flores v. Evergreen at San Diego, LLC* (2007) 148 Cal.App.4th 581, 587-588.)

Here, D.W.'s grandmother did nothing to suggest she had granted his mother the authority to assign to Dameron direct payment of the MP benefits she had secured by paying for D.W. to have this coverage. Quite the contrary, she collected those benefits

17

herself.  D.W.'s mother's signature on the form did not create an assignment of the MP benefits.

Similarly, while in some cases courts have recognized equitable assignments, no such assignment occurred here.  " 'Evidence of an equitable assignment must be clear and specific, [and] the assignor must not retain any control over the fund or any authority to collect.'  (*Iriart v. Southwest Fertilizer etc. Co.* (1958) 51 Cal.2d 270, 275 [332 P.2d 285].)  It has also been said that an equitable assignment 'is implied from the conduct of the parties rather than established by express words of formal assignment.'  (*First Nat. Bank v. Pomona Tile Mfg. Co.* (1947) 82 Cal.App.2d 592, 606 [186 P.2d 693].)  The doctrine of equitable assignments is typically used to enforce an attempted assignment of rights that is technically defective or to create a right of subrogation.  (See, e.g., *Kelly v. Kelly* (1938) 11 Cal.2d 356, 364 [79 P.2d 1059, 119 A.L.R. 71] [' "equity will uphold assignments[] not valid at law" '] . . . .)"  (*Recorded Picture Co. (productions) Ltd v. Nelson Entm't* (1997) 53 Cal.App.4th 350, 368.)  Nothing D.W. or his grandmother did suggests they intended to assign direct payment of his MP benefits to Dameron.

Dameron cannot claim it possessed a valid assignment of direct payment of MP benefits payable for treatment of D.W.'s injuries.  Family code statutes cited by Dameron do nothing to change our conclusion.  Family Code section 4053 sets out the obligation of parents to provide financial support to their children, and section 6701 identifies forms of contracts minors cannot make.  Neither of them indicates that a parent can assign away benefits due to their child under an insurance policy taken out by a non-parent legal guardian.

*Dameron Cannot Rely on the COA's to Collect Stephen L.'s UM Benefits, but It Might Be Able to Collect R.D.'s MP Benefits*

A. Additional Facts

1. Stephen L.'s Benefits and Payment for His Treatment

Stephen L. was in an automobile accident on August 29, 2010, and Dameron provided him medical services that day. According to a letter CSAA sent to Stephen L., at the time of the accident, he had UM coverage with a cap of $30,000 and MP coverage with a cap of $5,000.

In October 2010, CSAA sent Stephen L. a statement indicating there was a balance owing of $8,051 for Dameron's medical services following the accident. CSAA indicated in the letter that Stephen L. had reached his MP policy limit of $5,000, and all further bills would be forwarded to Stephen L. for handling. CSAA also sent Stephen $5,000 in MP benefits, payable to Dameron.

In December 2010, Dameron sent CSAA a letter indicating Stephen L. had assigned both his MP and UM benefits to Dameron. The header of the letter Dameron sent CSAA indicated $3,051 was still due for services Dameron provided Stephen L.

In March 2011, CSAA paid Stephen L. an undisclosed amount of UM benefits to settle any UM claim he might have with them as a result of the August 2010 automobile accident. On May 4, 2011, Dameron sent CSAA a letter demanding AAA pay it the lesser of $3,051 or what it had paid to Stephen L. in UM benefits. Dameron is not here seeking to collect further amounts from Stephen L.'s MP benefits, but is only claiming UM benefits.

2. R.D.'s Benefits and Payment for His Treatment

R.D. was in an accident on December 31, 2010, and Dameron treated him for related injuries on January 4, 2011. According to a letter to him from CSAA, R.D. had MP coverage with a $5,000 cap. According to Haupt, on January 26, 2011, Dameron

informed CSAA that R.D. had assigned all of his insurance benefits directly to Dameron. It appears R.D. signed his COA.

On February 18, 2011, AAA sent R.D. a payment of $147 in MP benefits to cover medical expenses incurred for services provided by Radiology Consultants on January 4, 2011. Also on February 18, 2011, AAA sent R.D. a payment of $4,853 as partial payment for services received from Dameron on January 4, 2011. In a letter sent to R.D. on the same day, AAA explained, "[w]e recently received the enclosed medical bill" for services from Dameron. "However--as we previously advised you--your policy[] provides coverage up to the policy limits. As you have reached your policy limits, we cannot pay for this bill, so we are forwarding it on to you. The total bill was $6,110.23. We paid $4,853.00. The unpaid amount is $1,257.23. [¶] We have sent this payment to you directly. Please forward it to the hospital."

On March 16, 2011, Haupt sent CSAA a letter demanding CSAA forward Dameron a payment of $4,853.

B. The COAs Are Adhesion Contracts

"The term 'adhesion contract' refers to standardized contract forms offered to consumers of goods and services on essentially a 'take it or leave it' basis without affording the consumer a realistic opportunity to bargain and under such conditions that the consumer cannot obtain the desired product or services except by acquiescing in the form contract." (*Wheeler v. St. Joseph Hospital* (1976) 63 Cal.App.3d 345, 356 (*Wheeler*).) "The distinctive feature of a contract of adhesion is that the weaker party has no realistic choice as to its terms. [Citations.] [¶] A hospital's standard printed 'Conditions of Admission' form possesses all the characteristics of a contract of adhesion. [Citations.] As the court stated in *Tunkl v. Regents of University of California* [(1963)] 60 Cal.2d [92], 102: 'The would-be patient is in no position to reject the proffered agreement, to bargain with the hospital, or in lieu of agreement to find another

20

hospital. The admission room of a hospital contains no bargaining table where, as in a private business transaction, the parties can debate the terms of their contract. As a result, we cannot but conclude that the instant agreement manifested the characteristics of the so-called adhesion contract. . . .' " (*Wheeler*, 63 Cal.App.3d at pp. 356-357.)

Here, Haupt admits Dameron requires all patients it treats--or their family members--to sign the COAs. Thus, the COAs are adhesion contracts.

### C. Enforceability of Adhesion Contracts

With contracts of adhesion, "[e]nforceability depends upon whether the terms of which the adherent was unaware are beyond the reasonable expectations of an ordinary person or are oppressive or unconscionable. ' "In dealing with standardized contracts, courts have to determine what the weaker contracting party could legitimately expect by way of services according to the enterpriser's 'calling' and to what extent the stronger party disappointed reasonable expectations based on the typical life situation." ' [Citations.]" (*Wheeler*, 63 Cal.App.3d at pp. 356-357.)

Though it did not consider this precise issue, the analysis in *Whiteside, supra,* 101 Cal.App.4th 693 informs our analysis of the assignment here and the extent it is enforceable.

In *Whiteside*, the Second District Court of Appeal considered whether a hospital breached its admissions agreements with a patient and his individual health insurer when, after the individual health insurer paid for the patient's service according to its agreement with the hospital, the hospital accepted an additional payment from another insurer with whom the patient held a group health insurance policy. (See *id.,* 101 Cal.App.4th at pp. 698 & 700.) The court held that both the contracts and California law permitted the hospital to collect the additional payment from the group insurer. (*Id.* at p. 698.) The court reasoned, "[e]ven viewing the Conditions of Services agreement as a contract of adhesion, and subjecting it to close scrutiny, we reach the same result. The assignment

21

clause, and the applicable contracts taken as a whole, do not defeat the *reasonable expectation* of insureds who choose to use preferred providers. Such insureds benefit substantially when using a preferred provider. Under the Blue Shield policy here, if an insured uses a nonpreferred provider, he or she would be obligated to pay the difference between the rate Blue Shield specifies it will pay for nonpreferred provider's services and the amount of the hospital's customary charges; some nonpreferred providers' services are not covered at all; and use of nonpreferred providers substantially increases the calendar year deductible. Whiteside's notion that by having dual coverage he could 'pocket' the money from his group policy every time he had a claim that was covered by his personal insurer is simply not a reasonable expectation. He either ignores or misapprehends the provisions of his insurance policies regarding the payment of claims. *The basic obligation of the medical insurers is to pay the medical providers directly for their services and to insulate the insured from any monetary obligation for such medical care. Whiteside is entitled to no more than that under the terms of his coverage.*" (*Id.* at p. 705, italics added.)

D. The COA Did Not Create an Assignment of UM Benefits but May Have Created an Assignment of MP Benefits

In contrast to the health insurance benefits at issue in *Whiteside*, persons with UM policies expect benefits to be paid directly to them to compensate them for their bodily injuries. It simply isn't within the reasonable expectation of a patient to expect it will be made to assign its UM benefits under an automobile insurance policy. This is particularly true when, as here, the automobile insurer offers UM coverage to "pay damages, other than punitive or exemplary damages, for bodily injury," as opposed to the distinct category of MP coverage to pay "reasonable expenses incurred within one year from the date of [the] accident by an insured person who sustains bodily injury as a result of an accident covered under this Part for necessary medical, surgical, X-ray, and dental

22

treatment . . . ." A patient, like Stephen L., who has secured both UM and MP benefits, would not expect a hospital to rely on benefits he is owed in damages as a result of his bodily injury when there is a separate category of benefits he secured to pay for medical expenses.

However, the same clear conclusion cannot be said with respect to R.D.'s MP benefits. Given this record, it is possible a trier of fact might conclude it was within his reasonable expectations that Dameron would seek to collect direct payments from CSAA out of R.D.'s MP benefits. First, the benefits exist to cover medical expenses, not damages for bodily injuries suffered. Second, the CSAA policy indicates that MP benefits may be paid to "person(s) providing the necessary services, . . . as we deem appropriate." Third, the record suggest that, at least with respect to one other patient, CSAA did send some payments from MP benefits directly to a medical care provider instead of the patient. Though the fact that the MP coverage is imbedded in an automobile insurance policy suggests that perhaps, a patient would not expect a hospital to collect payments from MP benefits directly from his MP provider, there remains a factual question as to whether, under these facts, it was within the reasonable expectations of R.D. that Dameron could also collect directly from CSAA payment for his medical treatment out of his MP benefits based on an agreement he signed when he sought treatment from Dameron.

CSAA's brief contains various arguments as to why Dameron might, ultimately, not be able to succeed in its claim that CSAA improperly refused to acknowledge and make a payment to Dameron under R.D.'s assignment of MP benefits, but none persuades us that CSAA has demonstrated Dameron cannot show an assignment was properly made and CSAA improperly ignored it.

For example, as reflected in its summary of issues regarding R.D., CSAA takes the position that all R.D.'s MP benefits were exhausted before Dameron informed CSAA that there was an assignment. But (1) Haupt declared that Dameron advised CSAA of its

23

claims on January 26, 2011; (2) in a March 16, 2011, letter to CSAA that CSAA included with its exhibits to the trial court, Haupt indicates he sent a notice of the assignment to CSAA along with bills January 26, 2011; and (3) CSAA did not remit payments to R.D. until February 18, 2011.

Under these facts, CSAA cannot with certainty negate the fact that it is possible CSAA received a notice of assignment before it made payments that exhausted all of R.D.'s MP benefits. Similarly, CSAA argues that because none of the signatures to the COAs have been authenticated, they are inadmissible. But, Haupt declares that the records, which include R.D.'s COA, are true and correct copies of records from patient files, and CSAA points to no evidence that suggests Dameron will be unable to authenticate the signatures to the COAs should the case go to trial.

As a second example, contrary to CSAA's suggestion, in sustaining CSAA's objections to Dameron's evidence below, the trial court does not appear to sustain objections as to the foundation of the documents themselves. Rather, the court appears to (1) sustain objections about how Haupt interprets the import of the COAs; and (2) agree with CSAA regarding arguments made about the authority of family members, instead of the patients, to sign COAs making the assignments. Thus, CSAA's position that Dameron, on this record, will be unable to authenticate the COAs is misplaced.

VI

Insurance Code Section 520 and *Fluor Corp. v. Superior Court* (2015) 61 Cal.4th 1175
Do Not Change Our Conclusion

Dameron argues that Insurance Code section 520; *Fluor Corp. v. Superior Court* (2015) 61 Cal.4th 1175 (*Fluor*); and, to a lesser extent, *Henkel Corp. v. Hartford Accident and Indemnity Company* (2003) 29 Cal.4th 934 (*Henkel*), require CSAA to accept the purported assignment of benefits contained in all the COAs the patients signed. We disagree.

24

Insurance Code section 520 states that, "[a]n agreement not to transfer the claim of the insured against the insurer after a loss has happened, is void if made before the loss except as" not relevant here.

In *Henkel*, our Supreme Court considered whether a corporate entity that had acquired the product line of another corporate entity had "acquired the benefits of the insurance policies issued by" an insurer to the original owner of the product line "to cover lawsuits based on injuries sustained during the policy period." The Court reached its decision without considering Insurance Code section 520, and concluded "that under the circumstances of this case any assignment of benefits does require the consent of the insurers." (*Henkel*, *supra*, 29 Cal.4th at p. 938; see *Fluor*, *supra*, 61 Cal.4th at p. 1180 [noting Insurance Code section 520 was not cited in *Henkel*].) As part of its analysis, the Court observed that, "each of the [insurance] policies [at issue] contained clauses providing that there could be no '[a]ssignment of interest under this policy' without the insurer's consent endorsed on the policy," and that, "[s]uch clauses are generally valid and enforceable." (*Henkel*, *supra*, 29 Cal.4th at p. 943.)

In *Fluor*, our Supreme Court revisited its *Henkel* "determination . . . regarding the enforceability of 'consent-to-assignment' clauses in third party liability insurance policies" in light of Insurance Code section 520 and concluded it "dictates a result different from that reached in *Henkel*." (*Fluor*, *supra*, 61 Cal.4th at p. 1180.) Accordingly, the Court held that a consent-to-assignment clause that read, "[a]ssignment of interest under this policy shall not bind the Company until its consent is endorsed hereon," could not operate to allow a third party liability insurer to refuse "to honor an insured's assignment of the right to invoke defense or indemnification coverage regarding" a loss that occurs within the time limits of the policy. (*Id.* at pp. 1183 & 1224.)

The issues raised here are distinguishable from the issues considered by *Henkel*, *Fluor*, and Insurance Code section 520. Here, we are not considering a scenario in which

CSAA relies upon an anti-assignment provision in its policies with its insureds to refuse to honor otherwise lawful assignments. We are dealing with an insurer that, with respect to O.N. and P.F., has refused to accept assignments that are, by their very nature, contrary to public policy and unlawful. With respect to Stephen L., we are dealing with an assignment that is not enforceable due to the adhesive nature of the COAs and the reasonable expectations of a patient signing a COA. With respect to D.W., we are dealing with a situation where the owner of the rights to insurance benefits never approved the assignment. "It is axiomatic that cases are not authority for propositions not considered." (*People v. Ault* (2004) 33 Cal.4th 1250, 1275, fn. 10.)

VII

*Dameron Forfeited Any Possible ERISA Arguments*

In its reply brief, Dameron indicates that O.N.'s health insurer is Dameron's self-funded plan under the Employee Retirement Income Security Act of 1974 (ERISA; 29 U.S.C. 1001 et seq.), without referring to the significance of or citing specific provisions of ERISA. At oral argument, Dameron argued that ERISA requirements allow it to collect O.N.'s MP benefits here. " 'We do not consider arguments that are raised for the first time at oral argument.' (*Haight Ashbury Free Clinics, Inc. v. Happening House Ventures* (2010) 184 Cal.App.4th 1539, 1554, fn. 9 [ ].)" (*Rosen v. St. Joseph Hospital of Orange County* (2011) 193 Cal.App.4th 453, 465, fn. 4.) Additionally, to the extent Dameron maintains stating in its reply brief that O.N.'s insurer was an ERISA plan raised an ERISA issue, Dameron forfeited any argument regarding ERISA by failing to include it in the opening brief. (*Garcia v. McCutchen* (1997) 16 Cal.4th 469, 482, fn. 10 [appellant may not raise new argument in reply brief].)

26

DISPOSITION

We remand to the trial court to allow the case to proceed on the second cause of action consistent with this opinion as to R.D. The judgment is otherwise affirmed.

                                        _____

                                        HULL, J.

We concur:

_____

RAYE, P. J.

_____

MAURO, J.

Filed 2/2/22

<u>CERTIFIED</u> <u>FOR</u> <u>PUBLICATION</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| DAMERON HOSPITAL ASSOCIATION, | C086518 |
| Plaintiff and Appellant, | (Super. Ct. No. STKCVUOCT20110006939) |
| v. | |
| AAA NORTHERN CALIFORNIA, NEVADA & UTAH INSURANCE EXCHANGE, | ORDER CERTIFYING OPINION FOR PUBLICATION AND DENYING REHEARING |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of San Joaquin County, Roger Ross, Judge. Affirmed in part and remanded in part.

HATTON, PETRIE & STACKLER, Gregory M. Hatton and John A. McMahon for Plaintiff and Appellant.

CODDINGTON, HICKS & DANFORTH, Richard Wardell Loveland and Min K. Kang for Defendant and Respondent.

1

THE COURT:

The opinion in the above-entitled matter filed on January 5, 2022, was not certified for publication in the Official Reports. For good cause it now appears that the opinion should be published in the Official Reports and it is so ordered.

Appellant's petition for rehearing is denied.

BY THE COURT:


_____
RAYE, P. J.


_____
HULL, J.


_____
MAURO, J.

2